UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>JOSEPH SHAYOTA, et al.,<br><br>Defendants. | Case No. 15-CR-00264-LHK<br><br>**ORDER DENYING MOTION TO SUPPRESS EVIDENCE**<br><br>Re: Dkt. No. 112 |

On March 23, 2016, defendants Mario Ramirez and Camilo Ramirez (the "Ramirezes") filed a Motion to Suppress Evidence ("Motion"), ECF No. 112, joined by defendant Walid Jamil, ECF No. 120. The Government filed an Opposition. ECF No. 133. The Ramirezes filed a Reply. ECF No. 138.

The Court held a hearing on the Motion on May 13, 2016. Having considered the parties' submissions, argument, the record in this case, and the relevant law, the Court DENIES the Motion to Suppress.

**I.  BACKGROUND**

A three-count indictment was filed on May 14, 2015 against defendants Joseph Shayota, Adriana Shayota, Justin Shayota, Walid Jamil, Raid Jamil, Kevin Attiq, Fadi Attiq, Leslie Roman,

1
Case No. 15-CR-00264-LHK
ORDER DENYING MOTION TO SUPPRESS EVIDENCE

Juan Romero, Mario Ramirez, and Camilo Ramirez (collectively, "Defendants"). ECF No. 1 ("Indictment"). All Defendants are named in each of the three counts of the Indictment, which relates generally to alleged criminal conspiracies to manufacture and distribute counterfeit bottles of a liquid dietary supplement known as "5-Hour ENERGY." *Id.* ¶ 1. The Indictment alleges that a group of commonly owned and controlled companies, referred to collectively as "Living Essentials," owns the trademarks and copyrights related to 5-Hour ENERGY. *Id.* The Indictment further alleges that the Ramirezes' role was to design and print counterfeit 5-Hour ENERGY boxes. *Id.* ¶¶ 15–16.

The Ramirezes' Motion concerns evidence obtained several years earlier in connection with a civil suit in the Eastern District of New York. On October 25, 2012, Living Essentials filed a civil complaint against a number of defendants, alleging that the defendants sold or distributed counterfeited 5-Hour ENERGY. *See Innovation Ventures, LLC et al. v. Ultimate One Distributing Corp.*, No. 12-CV-05354-KAM, ECF No. 1 (E.D.N.Y. Oct. 25, 2012). In connection with that action, Living Essentials applied for, and obtained, several *ex parte* civil seizure orders pursuant to 15 U.S.C. § 1116(d)(1)(A). Those orders permitted seizure of counterfeit 5-Hour ENERGY, as well as related materials, such as records concerning merchandise bearing the 5-Hour ENERGY marks and equipment used to bottle, label, or package counterfeit 5-Hour ENERGY.

One such order directed a seizure at the premises of Midwest Wholesale Distributors ("Midwest"). *See Innovation Ventures*, No. 12-CV-05354-KAM, ECF No. 41 at 2 ("Seizure Order").[1] Midwest's principals include Walid Jamil and Justin Shayota, who are also named as defendants in the instant criminal action. *See* ECF No. 133-3 at 12, 16 (Kevin Attiq Depo. Tr. 10:19–21, 28:4–13); ECF No. 133-2 ¶ 6. The Seizure Order listed three specific addresses at which Midwest was believed to be operating, including the address at issue here: 7920 Airway Road, Suite A1, San Diego, California, 95124 ("7920 Airway Road"). Seizure Order at 2. The

---

[1] A copy of the Seizure Order has been filed in the instant matter as ECF Nos. 112-1 and 133-5. Although the Seizure Order appears to have been signed and issued under seal in the Eastern District of New York on November 13, 2012, *see* Seizure Order at 15, it was filed on November 15, 2012.

2
Case No. 15-CR-00264-LHK
ORDER DENYING MOTION TO SUPPRESS EVIDENCE

Ramirezes state that in early 2012, Midwest actually subleased the 7920 Airway Road location to MCR Innovations & Packaging, Inc. ("MCR Innovations"). ECF Nos. 112 at 4–5; 112-5. Although the record is not entirely clear, MCR Innovation's principals include Walid Jamil, who is also a principal of Midwest, as well as Mario Ramirez and Camilo Ramirez, neither of whom appear to be officers or employees of Midwest. ECF No. 112 at 4 (Ramirezes); ECF No. 112-5 at 2 (identifying Walid Jamil as President of MCR Innovations). A seizure pursuant to the Seizure Order was executed at 7920 Airway Road on November 15, 2012 in the civil case.

As noted above, in 2015, the Ramirezes were indicted in this criminal action. The Ramirezes now move to suppress evidence obtained as a result of the execution of the Seizure Order on three grounds. First, the Ramirezes contend that the Seizure Order did not comply with 15 U.S.C. § 1116(d), because it permitted "an exhaustive or intrusive search of the premises," rather than being directed to the seizure of items. ECF No. 112 at 6. Second, the Ramirezes contend that the Seizure Order did not comply with 15 U.S.C. § 1116(d) because two of the factual findings upon which the Seizure Order was based were "clearly erroneous and not based on facts specific to any of the civil defendants." *Id.* at 7. Third, the Ramirezes contend that the civil plaintiffs intentionally misled the Eastern District of New York court that issued the Seizure Order into believing that Midwest instead of MCR Innovations operated at 7920 Airway Road. *Id.* at 8.

## II. DISCUSSION

To provide context for the Ramirezes' claims, the Court begins by providing a brief overview of civil seizure orders, and then addresses each of the Ramirezes' contentions in turn.

### A. Overview of Civil Seizure Orders

Congress authorized the issuance of civil seizure orders under 15 U.S.C. § 1116(d) to permit trademark plaintiffs "to preserve the evidence necessary to bring trademark counterfeiters to justice." *In re Lorillard Tobacco Co.*, 370 F.3d 982, 987 (9th Cir. 2004). The statute is available in civil actions involving the use of a counterfeit mark. 15 U.S.C. § 1116(d)(1)(A). Under the statute, a court may, upon application, issue an *ex parte* seizure order "providing for the

1  seizure of goods and counterfeit marks involved in such violation and the means of making such
2  marks, and records documenting the manufacture, sale, or receipt of things involved in such
3  violation." *Id*. The statute requires, among other things, that the United States Attorney in the
4  district where the order is sought be notified, *id.* § 1116(d)(2), and that the application be based on
5  an affidavit or similar sworn document. *Id.* § 1116(d)(3)(A). Furthermore, a party seeking a
6  seizure order must post a bond against claims of wrongful seizure, and the court must hold a
7  hearing promptly after the *ex parte* seizure order issues. *Id.* §§ 1116(d)(4)(A), (d)(10)(A).

8  In addition, as is relevant to the Ramirezes' claim, an application for a civil seizure order
9  may not be granted unless the court finds that it clearly appears from specific facts that: (1) "an
10 order other than an ex parte seizure order is not adequate to achieve the purposes of [15 U.S.C. §
11 1114]"; (2) "the applicant has not publicized the requested seizure"; (3) "the applicant is likely to
12 succeed in showing that the person against whom seizure would be ordered used a counterfeit
13 mark in connection with the sale, offering for sale, or distribution of goods or services"; (4) "an
14 immediate and irreparable injury will occur if such seizure is not ordered"; (5) "the matter to be
15 seized will be located at the place identified in the application"; (6) "the harm to the applicant of
16 denying the application outweighs the harm to the legitimate interests of the person against whom
17 seizure would be ordered of granting the application"; and (7) "the person against whom seizure
18 would be ordered, or persons acting in concert with such person, would destroy, move, hide, or
19 otherwise make such matter inaccessible to the court, if the applicant were to proceed on notice to
20 such person." 15 U.S.C. § 1116(d)(4)(B).

21 Seizures carried out pursuant to Section 1116(d) are subject to Fourth Amendment
22 scrutiny. *See, e.g.*, *Gucci Am., Inc. v. Accents*, 955 F. Supp. 279, 281–82 (S.D.N.Y. 1997) ("As a
23 general matter, the fact that a court-ordered seizure . . . arises from the application of a private
24 party in a civil action does not exempt it from scrutiny under the Fourth Amendment. . . .
25 Accordingly, such responses to Fourth Amendment violations as suppression of unlawfully-seized
26 evidence may well be available to victims of unlawfully-obtained seizure orders under the
27 Trademark Counterfeiting Act, even if the goods prove in fact to be counterfeit."). Courts

28

consistently hold, however, that civil seizure orders issued in accordance with Section 1116(d)'s extensive requirements satisfy the requirements of the Fourth Amendment. *See, e.g.*, *NBA Properties v. Does*, 113 F.3d 1246, 1997 WL 271311 (10th Cir. 1997) (unpublished) (civil seizure order satisfying 15 U.S.C. § 1116(d) "satisfied the Fourth Amendment requirements"); *Gucci Am., Inc.*, 955 F. Supp. at 282 ("[H]ere all the careful requirements for issuance of the seizure orders were met, and thus the seizure orders did not violate the defendants' Fourth Amendment rights"); *Reebok Int'l Ltd. v. Su Youn Pak*, 683 F. Supp. 929, 930 (S.D.N.Y. 1987) (civil seizure order issued pursuant to 15 U.S.C. § 1116(d) satisfied Fourth Amendment requirements).

### B. Seizure Order's Authorization of a Search

The Ramirezes first contend that the application of Section 1116(d) in this case to obtain the Seizure Order violated the Fourth Amendment because "[t]he Seizure Order permitted both a broad ranging *search* and a seizure," ECF No. 112 at 6, but Section 1116(d) provides only for the "seizure of goods and counterfeit marks involved in such violation and the means of making such marks, and records documenting the manufacture, sale, or receipt of things involved in such violation." The Government responds that a seizure order covering particular items at a particular location necessarily requires a search for those items at that location, and that the Seizure Order in this case both specified the items to be seized and where on the premises a search was permitted to locate the items for seizure. ECF No. 133 at 6.

The Government has the better of this argument. The Ramirezes cite no authority for an interpretation of Section 1116(d) that would limit civil seizure orders to permitting only the seizure of items in plain view, or that are otherwise immediately apparent without any incident search at the location specified by the seizure order. Moreover, the Ramirezes' interpretation would be inconsistent with the plain language of Section 1116(d), which permits seizure of not only counterfeit goods themselves, but of "records documenting the manufacture, sale or receipt of things involved in such violation." 15 U.S.C. § 1116(d)(1)(A). It is implausible to assume that the statute requires a court to determine, much less specify, which particular drawer of a particular filing cabinet would contain the records to be seized, rather than permitting a reasonable search to

5

seize specified items at "the place identified in the application." *Id.* § 1116(d)(4)(B)(v).

In addition, to the extent that the Ramirezes contend that the incidental search permitted by the Seizure Order to locate the items for seizure was impermissibly broad, the Court rejects that argument. The list of spaces which could be searched at 7920 Airway Road—which included rooms, closets, cabinets, desks, phones, computer drives, and the like—is congruent with the items to be seized. *See* Seizure Order at 3–4. As the Supreme Court has observed in a different context, "probable cause to believe that a stolen lawnmower may be found in a garage will not support a warrant to search an upstairs bedroom." *Horton v. California*, 496 U.S. 128, 140 (1990). The Seizure Order here raises no such Fourth Amendment concerns. While physical counterfeit 5-Hour ENERGY might be seized from rooms, closets, and cabinets, "records documenting the manufacture, sale or receipt" of such counterfeit goods would naturally be located in desks, phones, and on computers. 15 U.S.C. § 1116(d)(1)(A); *see also* Seizure Order at 2–3 (directing seizure of "business records . . . relating or referring in any manner to . . . merchandise bearing the 5-Hour ENERGY Marks"). The Ramirezes' contention that the Seizure Order permitted an overly broad search at 7920 Airway Road untethered to the authorized seizure is therefore without merit.[2]

### C. Factual Findings Underlying Seizure Order

The Ramirezes also contend that the Seizure Order failed to comply with Section 1116(d) because it was based on "clearly erroneous" factual findings as to two related statutory elements. Mot. at 7. Specifically, before issuing an *ex parte* seizure order, a court must find "that it clearly appears from specific facts" that "(i) an order other than an ex parte seizure order is not adequate to achieve the purposes of section 1114 of this title" and that "the person against whom seizure would be ordered, or persons acting in concert with such person, would destroy, move, hide, or otherwise make such matter inaccessible to the court, if the applicant were to proceed on notice to

---

[2] The Ramirezes also noted that a written inventory list was not provided to, and the seized items were not placed in the custody of, the U.S. District Court for the Eastern District of New York. *See* ECF No. 138 at 2. At oral argument, counsel for the Ramirezes clarified that those arguments were related to evidentiary issues that may be raised at a later date, and that the Ramirezes did not allege a Fourth Amendment violation or contend suppression was proper on that basis.

6
Case No. 15-CR-00264-LHK
ORDER DENYING MOTION TO SUPPRESS EVIDENCE

such person." 15 U.S.C. § 1116(d)(4)(B)(i), (vii). Here, the issuing court found with regard to Section 1116(d)(4)(B)(i) that:

> There is clear evidence that the Distributing Defendants sold counterfeit 5-hour ENERGY® featuring counterfeits of Plaintiffs' valid, protectable trademarks. . . . The Distributing Defendants either knew, or should have known, that their conduct was unlawful. . . . Because the Distributing Defendants' conduct can result in criminal prosecution, there is a very real risk that the Distributing Defendants will destroy or conceal the evidence of their misconduct—including the purchase and sale documentation and the inventory itself—if put on notice of this action and given the ordinary amount of time to respond to a conventional discovery request.

Seizure Order at 12. The issuing court's finding with regard to Section 1116(d)(4)(B)(vii) similarly stated: "By selling counterfeit 5-hour ENERGY®, the Distributing Defendants may have knowingly and intentionally engaged in a criminal act. . . . Given the spectre [sic] of criminal prosecution, there is a real risk that the Distributing Defendants will destroy records and inventory to cover up their unlawful conduct." Seizure Order at 14. The issuing court thus determined that an order other than an *ex parte* seizure order was not appropriate on the facts before it.

Although the Seizure Order undisputedly states that Midwest (as a "Distributing Defendant") was selling counterfeit 5-Hour ENERGY and contains a specific factual finding that the statutory requirements at issue were satisfied, the Ramirezes argue the finding is clearly erroneous because it "relied entirely on evidence that the Distributing Defendants knew or should have known their conduct was illegal, and could face criminal prosecution." Mot. at 7. In this regard, the Ramirezes rely on *Lorillard Tobacco Co. v. Bisan Food Corp.*, 377 F.3d 313, 321 (3d Cir. 2004), to argue that such "incentive based" reasoning is impermissibly generalized because every counterfeiter has the same incentive to avoid criminal prosecution.

The Ramirezes' argument, however, glosses over the substantial factual record in front of the Eastern District of New York court at the time the Seizure Order was issued. *See, e.g.*, *Gucci Am.*, 955 F. Supp. at 282 (rejecting challenge to factual findings after examining record and affidavits and noting that "it is important to note that the plaintiffs' applications for these orders were cumulative in nature"). The materials before the issuing court included, among other things, the November 13, 2012 declaration of Geoffrey Potter detailing the basis for Living Essentials'

7

request for a seizure order directed at Midwest. *See* ECF No. 133-3 ("Potter Declaration"). Though not specifically cited in the portion of the Seizure Order setting forth the two findings challenged by the Ramirezes, the Potter Declaration is repeatedly cited throughout the Seizure Order and plainly was considered by the issuing court in determining whether the statutory requirements were satisfied. *See, e.g.*, Seizure Order at 10, 12, 14.

The Potter Declaration, which builds upon previous declarations for previous seizure orders in the case, traces the course of Living Essentials' investigation as to the source of counterfeit 5-Hour ENERGY in New York and explains the basis for Potter's specific belief that "Jamil and his entity Midwest played a pivotal role in the counterfeiting conspiracy." Potter Declaration ¶ 14.[3] Specifically, Potter stated over 1.8 million counterfeit bottles of 5-Hour ENERGY had been seized, all of which traced back to Midwest or a second company owned by the cousin of Walid Jamil, one of Midwest's principals. *Id.* ¶¶ 3, 11. Potter further stated that as a result of an October 29, 2012 seizure in California at a distributor named Dan-Dee, owned in part by Kevin Attiq, Living Essentials learned that Dan-Dee had purchased "more than $3 million in counterfeit 5-Hour Energy® from Midwest." *Id.* ¶¶ 14–15.[4] Documents obtained at that seizure showed that Dan-Dee sometimes wired payments to Walid Jamil directly instead of to Midwest's corporate account. *Id.* ¶¶ 11, 15. Payment for products purchased from Jamil was

---

[3] The Court's observation regarding declarations filed in support of earlier seizure orders is provided solely to explain the context in which the Potter Declaration was made. In evaluating the sufficiency of the Seizure Order, the Court relies only upon the declarations presented to the Eastern District of New York in connection with the Seizure Order itself. *See United States v. Stanert*, 762 F.2d 775, 778 (9th Cir.1985), *amended on other grounds*, 769 F.2d 1410 (9th Cir. 1985) (review for probable cause is limited to the information and circumstances contained within the four corners of the underlying affidavit).

[4] The Potter Declaration also refers to and attaches the deposition transcript of Kevin Attiq, taken shortly before the request for the Seizure Order was made. ECF No. 133-3 at 9. The transcript includes a notable exchange where Attiq describes loading 5-Hour ENERGY from Dan-Dee's warehouse onto a truck after speaking with Walid Jamil (one of Midwest's principals), shortly before execution of a seizure order against Dan-Dee. Attiq then had an employee drive the truck off premises during the seizure due to Attiq's "panic." ECF No. 133-3 at 16 (Kevin Attiq Depo. Tr. 22:7–24:16). The transcript includes, for example, the following question and answer: "Q. Isn't it true that you moved the product from Dan-Dee's parking lot to the Shell station so that it would not be found during the seizure? A. One of the truth, yes[.]" *Id.* at 16 (Kevin Attiq Depo. Tr. 25:9–13).

sometimes instead made to Joseph Shayota, the uncle of Midwest's principal, Justin Shayota, in irregular fashion via "stacks of cash." *Id.* Potter also stated that, based on Attiq's testimony, at least 600,000 bottles of counterfeit product in New York originated from Dan-Dee (and ultimately from Midwest). *Id.* ¶¶ 8, 10, 14–15. The declaration also referenced evidence that Midwest had corresponded with Videojet, a producer of industrial printers for adding codes or graphics to products or packaging (such as plastic bottles and cardboard cases on a production line). *Id.* ¶¶ 21–22. In short, although the issuing court's reasoning was abbreviated, in light of the factual record and the Seizure Order's reference to the Potter declaration, the Ramirezes' contention that the issuing court did not consider facts specific to Midwest is misplaced.

Against this factual background, the Ramirezes' reliance on the Third Circuit's decision in *Lorillard* is unpersuasive. There, a cigarette manufacturer's sales representative found a handful of packs of counterfeit cigarettes on the shelves of various grocery and liquor stores. 377 F.3d at 315–18. For example, among other merchandise for sale, one liquor store had four packs of counterfeit cigarettes. *Id*. A grocery store had five packs, while ten packs were found at a second grocery store. *Id.* In the ruling below, the district court denied the plaintiff's subsequent request for *ex parte* seizure orders based on the manufacturer's discovery of those minor quantities of counterfeit product and concluded that there was an insufficient basis to conclude that the stores would destroy evidence if the plaintiff were to proceed on notice rather than *ex parte*. *Id.* at 316.

In *Lorillard*, the Third Circuit found no abuse of discretion in the district court's denial, despite the plaintiff's argument that the retailers would destroy evidence because they had an incentive to avoid criminal prosecution. Although the Third Circuit noted that "[t]here is much force to this argument," the Third Circuit reasoned that requiring a district court to find that a defendant would destroy evidence whenever criminal liability was at issue would amount to "a *per se* rule that ex parte seizure must be ordered when counterfeit cigarettes are involved." *Id*. at 321–22. *Lorillard* thus affirmed the district court's discretion to reject an incentive-based argument where appropriate. However, *Lorillard* did not suggest that a district court was *compelled* do so when other facts suggest an *ex parte* seizure order is appropriate. *See, e.g.*, *Wangson*

1  *Biotechnology Grp. v. Tan Tan Trading Co.*, No. 08-CV-04212-SBA, 2008 WL 4239155, at *5
2  (N.D. Cal. Sept. 11, 2008) (denying *ex parte* seizure order and citing *Lorillard* for the proposition
3  that "the mere allegation a defendant is engaged in criminal counterfeiting, and thus has an
4  incentive to destroy evidence, *without more*, is insufficient to support granting an ex parte request
5  for a seizure order." (emphasis added)).

6        The record here is different than the record before the court in *Lorillard*. The record
7  before the Eastern District of New York court did not suggest that Midwest was a legitimate
8  grocery or liquor store with four, five or ten packs of counterfeit cigarettes among other
9  merchandise for sale. Rather, Midwest was a distributor linked to the sale of more than $3 million
10  dollars of counterfeit 5-Hour Energy bottles. *See, e.g.*, Potter Decl. ¶ 4–11, 14. The declarations
11  thus provided clear evidence that large-scale counterfeiting was occurring, clear evidence that
12  Midwest supplied the products at issue to others, and clear evidence that Midwest's role was not
13  minor. *Id.* ¶ 14. A reasonable inference from the sheer volume of sales is that Midwest was close
14  to the source of the counterfeit goods, in contrast to the four, five or ten cigarette packs found at
15  grocery or liquor stores in *Lorillard*. Moreover, in the instant case, the record before the issuing
16  court indicated that Midwest conducted business and obtained payment in unusual ways, including
17  payments in stacks of cash. *Id.* ¶ 11. Furthermore, a number of seizure orders had already been
18  executed, which revealed counterfeit product ultimately linked to Midwest, but also increased the
19  odds that Midwest would become aware of Living Essentials' investigation as seizures moved
20  further up the supply chain.

21        On these facts, the issuing court could reasonably conclude that Midwest, near the top of
22  the supply chain, had far more potential liability than an unwitting retailer or a small end-
23  purchaser of four to ten packs of counterfeit cigarettes, and more incentive to conceal evidence if
24  alerted to an impending seizure of its records and inventory. *Cf. Wangson*, 2008 WL 4239155 at
25  *5 (rejecting ex parte seizure order where it was "equally plausible that defendants may be
26  unwitting purchasers from deceptive sellers, rather than intentional re-sellers of counterfeit
27  products"). It is true that the record does not *compel* a finding that Midwest would destroy or

10

conceal evidence. However, in light of the substantial evidence concerning Midwest's major role in the alleged counterfeiting presented to the issuing court, this Court rejects the Ramirezes' contention that the issuing court clearly erred by determining Midwest, or persons acting in concert with Midwest, would do so.

### D. Challenge to Affidavit Upon Which Civil Seizure Order is Based

Finally, the Ramirezes contend that Living Essentials intentionally misled the Eastern District of New York court into believing that Midwest operated out of 7920 Airway Road while that location was actually subleased by Midwest to MCR Innovations. Mot. at 8. The Ramirezes rely on the allegedly intentional omission of three facts, linking Midwest to 7920 Airway Road, from the declaration of Josh Lichtman, Living Essentials' private investigator. *See* ECF No. 112-3 ("Lichtman Declaration"). Specifically, the Ramirezes allege that: (1) the pictures of 7920 Airway Road attached to the Lichtman declaration failed to show the "MCR Innovations" sign on the side of the building; (2) the telephone number that Lichtman informed the court was associated with 7920 Airway Road actually belonged to MCR Innovations; and (3) 7920 Airway Road had been subleased by Midwest to MCR Innovations. Mot. at 3–4, 8; ECF No. 133 at 4. The Ramirezes request a hearing under *Franks v. Delaware*, 438 U.S. 154 (1978), as a result of these omissions, arguing that the Seizure Order would not have issued as to 7920 Airway Road had the issuing court known of these facts.

"In *Franks*, the Supreme Court held that a defendant could challenge a facially valid affidavit by making a substantial preliminary showing that (1) the affidavit contains intentionally or recklessly false statements, and (2) the affidavit purged of its falsities would not be sufficient to support a finding of probable cause." *Stanert*, 762 F.2d at 780 (quotation marks omitted). A substantial preliminary showing that the affiant "intentionally or recklessly omitted facts required to prevent technically true statements in the affidavit from being misleading" can also provide the basis for a *Franks* hearing. *Id.* at 781. A defendant who, like the Ramirezes, challenges an affidavit on the basis of material omissions also bears the burden to show that the affidavit "supplemented by the omissions would not be sufficient to support a finding of probable cause."

11

Case No. 15-CR-00264-LHK
ORDER DENYING MOTION TO SUPPRESS EVIDENCE

*Stanert*, 762 F.2d at 782 (citing *Franks*, 438 U.S. at 171–72).

Although it is not clear that the Ramirezes have made a substantial showing that the omissions here were intentional or reckless[5], the Court need not resolve that issue because the Ramirezes have in any case failed to show that the affidavit supporting the Seizure Order would not be sufficient even if the affidavit included the omitted information. *See Stanert*, 762 F.2d at 782. As is relevant here, the Lichtman Declaration offered in support of the Seizure Order made the following statements supporting a finding that Midwest operated at 7920 Airway Road: (1) Lichtman's firm's "research of public records disclosed that the address 7920 Airway Road, Suite A1, San Diego, California 95124 is associated with defendant Justin Shayota, who is the principal of defendant Midwest Wholesale Distributors," *see* Lichtman Declaration ¶ 6; (2) on November 5, 2012, investigators from Lichtman's firm observed a Land Rover in front of 7920 Airway Road, registered to a corporation sharing the same Michigan address as Midwest, *id.* ¶ 7; (3) the registered agent for the corporation to which the Land Rover belonged was Heather Jamil, daughter of Midwest principal Walid Jamil, *id.*; (4) on November 9, 2012, Lichtman called a number associated with 7920 Airway Road, and the individual who answered said he worked for "Midwest Wholesale," *id.* ¶¶ 9–10; (5) the individual further confirmed that he worked for "Justin Shayota," a principal of Midwest, *id.* ¶ 10; and (6) the individual confirmed that Justin Shayota came into the office at 7920 Airway Road twice a month, *id.*

The specific factual statements in the Lichtman Declaration are plainly sufficient to establish probable cause that Midwest operated at 7920 Airway Road, or, as required by 15 U.S.C. § 1116(d)(4)(B)(v), to permit the court to determine that it clearly appears that "the matter to be seized will be located at the place identified in the application" when considered in combination with the Potter Declaration. Addition of the alleged omissions upon which the Ramirezes rely

---

[5] For example, a photograph of 7920 Airway Road attached to the declaration of Josh Lichtman *does* show the "MCR Innovations" sign, but the sign is not legible because the front of the entire building is photographed. ECF No. 112-3, at 6 (top photograph). Although clear proof of deliberate or reckless omission is not required at this stage, *Stanert*, 762 F.2d at 781, something more than speculation is required.

does not alter that result. The thrust of the Ramirezes' argument is that Lichtman should have disclosed that 7920 Airway Road was also associated with MCR Innovations, not just Midwest. In this regard, the Ramirezes argue that "Lichtman's declaration also did not reveal that the telephone number he allegedly called on November 9, 2012 belonged to MCR Innovations (and was not just 'associated with the 7920 Airway Road address')." Mot. 3–4.

Inclusion of that information in the Lichtman Declaration, however, would have *strengthened* the inference that Midwest operated at 7920 Airway Road. The fact that MCR Innovations telephones were answered by persons claiming to work for Midwest would have made it more likely, not less, that the court would view MCR Innovations and Midwest as both operating at 7920 Airway Road or as one company. Indeed, given that Lichtman was specifically informed by a person who answered the MCR Innovations phone at 7920 Airway Road that he worked for "Midwest Wholesale," that he worked for Justin Shayota (a Midwest principal), and that Justin Shayota came into the office twice a month, neither a picture of the MCR Innovations sign at 7920 Airway Road nor the fact that MCR Innovations subleased space from Midwest would substantially alter the likelihood that Midwest operated out of 7920 Airway Road.

The Ramirezes have failed to show that the Lichtman Declaration, even when "supplemented by the omissions," would be insufficient to support the Seizure Order. *Stanert*, 762 F.2d at 782. As a result, a *Franks* hearing is not warranted.

### III. CONCLUSION

For the foregoing reasons, the Ramirezes' Motion to Suppress is DENIED.

**IT IS SO ORDERED.**

Dated: May 13, 2016

_____
LUCY H. KOH
United States District Judge

Case No. 15-CR-00264-LHK
ORDER DENYING MOTION TO SUPPRESS EVIDENCE

13