UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| UNITED STATES,<br><br>                    Plaintiff,<br><br>          v.<br><br>JOSEPH SHAYOTA and<br>ADRIANA SHAYOTA,<br><br>                    Defendants. | Case No. 15-CR-00264-LHK<br><br>**AMENDED ORDER DENYING<br>MOTIONS FOR NEW TRIAL AND<br>MOTION FOR JUDGMENT OF<br>ACQUITTAL**<br><br>Re: Dkt. Nos. 499, 500, 501 |

This order supersedes ECF No. 597.

Before the Court are Adriana Shayota's motion for judgment of acquittal, ECF No. 499, Adriana Shayota's motion for a new trial, ECF No. 500, and Joseph Shayota's motion for a new trial, ECF No. 501. The government opposes all three motions. The Court held an evidentiary hearing on the issue of alleged juror misconduct on April 18, 2017. ECF No. 565. Having considered the submissions of the parties, the testimony at the evidentiary hearing, the record in the case, and the relevant law, the Court hereby DENIES all three motions.

## I.       BACKGROUND

### A.  Factual Background

The following facts are from the Government's Indictment, ECF No. 1, and the

Superseding Information, ECF No. 169.

Joseph Shayota was a principal of Tradeway, International Inc., d/b/a Baja Exporting LLC ("Baja Exporting"). Joseph Shayota's wife, Adriana Shayota, was the owner of Baja Exporting. ECF No. 169, at ¶ 7. 5-Hour ENERGY is a liquid dietary supplement made by Innovation Ventures, LLC; Living Essentials, LLC; and International IP Holdings, LLC (together, "Living Essentials"). *Id.* at ¶ 1. In late 2009, Joseph Shayota began to purchase Spanish-labeled 5-Hour ENERGY from Living Essentials for export to Mexico. *Id.* at ¶ 20. However, rather than selling the product in Mexico, Joseph Shayota diverted the product for sale in the United States. *Id.* Joseph Shayota was unable to sell the Spanish-language 5-Hour ENERGY in the United States. Therefore, Joseph Shayota organized a conspiracy to repackage the 5-Hour ENERGY bottles with English labels and resell them in the United States. *Id.* Baja Exporting sold its stock of repackaged and relabeled 5-Hour ENERGY by December 2011. *Id.* at ¶ 21. After selling the stock of genuine but relabeled and repackaged 5-Hour ENERGY, beginning in early 2012 Joseph Shayota organized a conspiracy to counterfeit the 5-Hour ENERGY liquid itself, package the 5-Hour ENERGY in counterfeit packaging, and sell the counterfeit product in the United States. *Id.* at ¶¶ 22–27.

Thus, the instant case involves two conspiracies. The first conspiracy, from late 2009 to December 2011, was a conspiracy to relabel and resell legitimate Spanish-labeled 5-Hour ENERGY with counterfeit English labels and boxes. The second conspiracy, from early 2012 to November 2012, was a conspiracy to manufacture counterfeit 5-Hour ENERGY liquid, place the liquid in counterfeit bottles with counterfeit labels in counterfeit boxes, and sell the counterfeit product.

In developing these conspiracies, Joseph Shayota was assisted by Adriana Shayota, who owned, and controlled the accounting for, Baja Exporting and who transferred funds to the entities described below to pay for their roles in the conspiracies. *Id.* at ¶ 7. Joseph Shayota was also

assisted by Walid Jamil, a relative of Joseph Shayota[1] and the owner of Midwest Wholesale Distributors ("Midwest"). *Id.* at ¶ 9; Trial Transcript ("T.") 11/14/16 at 19–20. Walid Jamil was assisted in the conspiracies by his brother, Raid Jamil. ECF No. 169, at ¶ 10. Walid Jamil hired MCR Printing and Packaging ("MCR") to manufacture boxes for the product. *Id.* at ¶ 9. MCR was owned by Mario Ramirez, who was assisted in the designing and printing of counterfeit boxes by his son, Camilo Ramirez. *Id.* at ¶¶ 14–15. Leslie Roman, who owned a company called Flexopack, manufactured the counterfeit 5-Hour ENERGY labels. *Id.* at ¶ 13.

The counterfeit 5-Hour ENERGY liquid and counterfeit bottles were manufactured by Juan Romero, owner of Advanced Nutraceutical Manufacturing, LLC ("Advanced Nutraceutical"). ECF No. 1, at ¶ 14. Juan Romero acquired empty bottles and bottle caps from companies in Guadalajara, Mexico. *Id.* Juan Romero manufactured the liquid in plastic barrels in a storage facility and then filled the bottles with the liquid. *Id.*

Justin Shayota, the nephew of Joseph and Adriana Shayota and Walid Jamil,[2] organized the repackaging and relabeling of the counterfeit 5-Hour ENERGY through the company that he owned, JT Wholesale, at the direction of Walid Jamil. ECF No. 169, at ¶ 8; T.11/14/16 at 19–20. Under Walid Jamil's instructions, Justin Shayota hired day laborers to use a steam tunnel to place labels on the bottles of counterfeit 5-Hour ENERGY and to use an inkjet printer to place lot numbers and expiration dates on the bottom of the bottles of counterfeit 5-Hour ENERGY. *Id.* Justin Shayota then shipped the bottles to Dan-Dee Company ("Dan-Dee"), which was a cash-and-carry warehouse owned by Kevin Attiq and his brother Fadi Attiq. Dan-Dee then sold the counterfeit 5-Hour ENERGY across the United States. *Id.* at ¶¶ 8, 11–12.

**B. Procedural Background**

**1. Indictment and Superseding Information**

On May 14, 2015, a federal grand jury returned a three-count Indictment against

---

[1] Walid Jamil's sister was married to Joseph Shayota's brother. Trial Transcript 11/14/16 at 19–20.
[2] Justin Shayota's father was Joseph Shayota's brother. Justin Shayota's mother was Walid Jamil's sister. T. 11/14/16 at 19–20.

Defendants Joseph Shayota, Adriana Shayota, Justin Shayota, Walid Jamil, Raid Jamil, Kevin Attiq, Fadi Attiq, Leslie Roman, Juan Romero, Mario Ramirez, and Camilo Ramirez (collectively, "Defendants"). ECF No. 1 ("Indictment"). The Indictment charged Defendants with one count of conspiracy to traffic in counterfeit goods in violation of 18 U.S.C. § 2320(a), one count of conspiracy to commit criminal copyright infringement in violation of 18 U.S.C. § 371, and one count of conspiracy to introduce misbranded food into interstate commerce in violation of 18 U.S.C. § 371. *Id.*

In response to a motion by Defendants, on May 10, 2016, the Court found that counts two and three of the Indictment were duplicative of each other. ECF No. 144, at 6–7. Therefore, on June 29, 2016, the Government filed a two-count Superseding Information in the United States District Court for the Northern District of California. ECF No. 169 ("Superseding Information"). The first count in the Superseding Information alleged conspiracy to traffic in counterfeit goods in violation of 18 U.S.C. § 2320(a). *Id.* ¶ 16–28. The second count in the Superseding Information alleged conspiracy to commit criminal copyright infringement and to introduce misbranded food into interstate commerce in violation of 17 U.S.C. § 506, 18 U.S.C. § 2319, and 21 U.S.C. §§ 331 & 333. *Id.* ¶ 29–32.

## 2. Severance Motions

The Court granted numerous severances in the course of the instant case. On March 23, 2016, Defendants Joseph Shayota and Kevin and Fadi Attiq filed motions to sever their trials from the trial of Walid Jamil. ECF Nos. 117, 111. The basis of Joseph Shayota's motion was that the Government would "introduce at trial out-of-court confessions or admissions made by [Walid] Jamil in the form of deposition testimony from [certain] related civil proceedings." ECF No. 145 at 5. Such testimony, Joseph Shayota argued, would run afoul of the holding in *Bruton v. United States*, 391 U.S. 123 (1968). The Court found Joseph Shayota's motion to sever premature, as the Government had not yet identified the deposition testimony it would offer at trial. *Id.* at 5–6. The Court therefore denied Joseph Shayota's motion to sever without prejudice.

The basis for Kevin and Fadi Attiq's motion to sever was that Walid Jamil had filed a

declaration stating that Walid Jamil would offer exculpatory testimony as to Kevin and Fadi Attiq if Walid Jamil were tried separately from Kevin and Fadi Attiq. The Court granted Kevin and Fadi Attiq's motion to sever. *Id.* at 5. In reaching this conclusion, the Court noted that Kevin and Fadi Attiq "ha[d] made a reasonable showing that [co-Defendant] Walid Jamil would testify if severed," and that Walid Jamil would offer exculpatory testimony. *Id.* at 3. "In particular," Kevin and Fadi Attiq had "provided a declaration from Walid Jamil directly stating that he would testify on behalf of [Kevin and Fadi Attiq] if their case were to be severed, but that he would not wish to testify at a joint trial." *Id.* at 3–4.

On August 24, 2016, the Court held a status conference in which the Court ordered the parties to meet and confer regarding severance issues and file a Joint Severance Status Report. ECF No. 207 at 1–2. The parties filed their Joint Severance Status Report on August 26, 2016. ECF No. 208. In this report, the parties agreed to hold one joint trial for Joseph Shayota and Adriana Shayota and one joint trial for Kevin Attiq and Fadi Attiq. *Id.* at 1. The Government proposed to try the remaining Defendants in a single trial: Walid Jamil, Raid Jamil, Leslie Roman, Mario Ramirez, and Camilo Ramirez. *Id.* "All of the Defendants, except for Raid Jamil, Mario Ramirez[,] and Camilo Ramirez, stipulate and agree[d]" to these proposed trial groupings. *Id.*

On September 13, 2016, the Court granted a motion by Mario Ramirez and Camilo Ramirez to sever their trial from the joint trial of Walid Jamil and Leslie Roman. ECF No. 238. Thus, on September 13, 2016, the Court was prepared to hold the following four trials starting on October 24, 2016 and continuing through February 17, 2017: (1) Walid Jamil and Leslie Roman, (2) Joseph Shayota and Adriana Shayota, (3) Kevin Attiq and Fadi Attiq, and (4) Mario Ramirez and Camilo Ramirez. ECF No. 238.

### 3. Guilty Pleas

On March 2, 2016, Justin Shayota pled guilty to Counts 1 and 3 of the Indictment pursuant to a plea agreement. ECF No. 105; ECF No. 106. On September 13, 2016, Raid Jamil pled guilty to Count 2 of the Superseding Information pursuant to a plea agreement. ECF No. 237. On September 23, 2016, Leslie Roman pled guilty to Count 2 of the Superseding Information

United States District Court
Northern District of California

pursuant to a plea agreement. ECF No. 275. On October 7, 2016, Walid Jamil pled guilty to Count 1 and Count 2 of the Superseding Information. ECF No. 297. On November 4, 2016, Kevin Attiq pled guilty to Count 2 of the Superseding Information. ECF No. 403. On November 9, 2016, Mario Ramirez pled guilty to Count 2 of the Superseding Information. ECF No. 412. Both Camilo Ramirez and Fadi Attiq entered pre-trial diversion programs, and on February 9, 2017 the Court dismissed the charges against Camilo Ramirez "because he . . . complied with all of the terms of the program." ECF No. 515. Juan Romero is a fugitive. ECF No. 147 at 4.

### 4. Co-Conspirator Statements

On August 19, 2016, the Government filed a notice identifying the co-conspirator statements the Government intended to present at trial. ECF No. 206 ("Gov't Notice"). Nearly all of the statements were from depositions taken in the consolidated civil proceedings entitled *Innovation Ventures, LLC, et al. v. Ultimate One Distributing Corp., et al.*, E.D.N.Y. Case No. 1:12-CV-05354-KAM-ST.

On September 21, 2016, the Ramirez defendants and the Shayota defendants moved to exclude the Government's proposed co-conspirator statements based on the Confrontation Clause and the rule against hearsay. ECF Nos. 269, 270. The Court provided the Ramirez defendants, the Shayota defendants, and the Government three rounds of briefing on the issue. *See* ECF Nos. 269, 270, 280, 291, 295, 296, 305, 307, 312.

On October 19, 2016, the Court filed an order granting in part and denying in part Defendants' motions to exclude co-conspirator's statements. ECF No. 331. In the order, however, the Court specified that the proposed co-conspirator statements would be admissible under the Confrontation Clause and former testimony exception to the rule against hearsay only if the Government were to make a sufficient showing that the declarants would be unavailable at trial. *Id.* at 11, 25. After briefing from the parties and pursuant to the Court's order, ECF No. 351, the Government established the unavailability at trial of Walid Jamil, Leslie Roman, Kevin Attiq, Fadi Attiq, Mario Ramirez, and Camilo Ramirez by questioning each defendant at a hearing on October 24, 2016, in response to which each defendant invoked his Fifth Amendment right not to

United States District Court
Northern District of California

testify. ECF No. 376.

### 5. Joseph and Adriana Shayota's Trial and Post-Trial Motions

The jury trial of Joseph and Adriana Shayota began on October 24, 2016. After opening statements on October 25, 2016, both Joseph and Adriana Shayota moved to sever their trials. Joseph Shayota argued that a severance was justified "because Adriana Shayota's opening statement raised Joseph Shayota's extramarital affair with Tyneisha Evans even though the Government's opening statement did not." ECF No. 384, at 1. Adriana Shayota argued that severance was justified because the Court had not accepted all of Adriana Shayota's proposed redactions to the November 27, 2012 deposition testimony to be introduced at trial against Joseph Shayota. ECF. No. 386, at 1. The Court denied these motions on October 28, 2016 for the reasons discussed in the orders. ECF Nos. 384 & 386.

The Government rested on November 18, 2016. Joseph and Adriana Shayota did not renew their motions to sever after the Government rested. However, after the Government rested, Joseph and Adriana Shayota moved for judgment of acquittal under Federal Rule of Criminal Procedure 29 on the grounds that the Government had failed to prove that the trademarks that Defendants had allegedly counterfeited were "in use" at the time of the conspiracies. T. 11/18/16 at 132–34. The Court denied the motion and noted that the Government had produced evidence that Defendants' co-conspirators had purchased and used legitimate 5-Hour ENERGY to counterfeit the 5-Hour ENERGY trademarks, which demonstrated that the trademarks in question were in use at the time of the conspiracies. *Id.* On November 28, 2016, the jury returned a verdict finding Joseph and Adriana Shayota guilty of both charges. ECF No. 468.

On January 17, 2017, Joseph and Adriana Shayota filed the instant three motions. Adriana Shayota filed a motion for judgment of acquittal, ECF No. 499, and a motion for a new trial, ECF No. 500. Joseph Shayota filed a motion for a new trial. ECF No. 501. Because Adriana Shayota's motion for a new trial was based in part on ineffective assistance of counsel, on January 23, 2017, the Government moved for an order finding waiver of Defendant's attorney-client privilege. ECF No. 502. The Court granted this motion on January 24, 2017. ECF No. 503. On January 27, 2017,

Joseph McMullen filed a motion to withdraw as Adriana Shayota's attorney, ECF No. 505, which the Court granted on January 30, 2017, ECF No. 506. On February 16, 2017, Gregory Vega and Adam Gordon filed a motion to withdraw as Joseph Shayota's attorneys, ECF No. 521, which the Court granted on April 10, 2017, ECF No. 562.

On February 21, 2017, the Government filed an opposition to Joseph Shayota's motion for a new trial. ECF No. 527. Also on February 21, 2017, the Government filed a consolidated opposition to Adriana Shayota's motion for judgment of acquittal and Adriana Shayota's motion for a new trial. ECF No. 528.[3] Joseph Shayota filed a reply on February 28, 2017. ECF No. 532. Adriana Shayota filed two separate replies supporting the motion for judgment of acquittal and the motion for a new trial on February 28, 2017. ECF Nos. 533–34. The Court held an evidentiary hearing on the issue of alleged juror misconduct on April 18, 2017. ECF No. 565.

## II. LEGAL STANDARD

### A. Motion for Judgment of Acquittal

Federal Rule of Criminal Procedure 29 allows a criminal defendant to move for a judgment of acquittal on the grounds of insufficient evidence after the entry of a guilty verdict. Under Rule 29, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original).

In deciding a Rule 29 motion, "[t]he district court . . . must bear in mind that it is the jury's exclusive function to determine the credibility of witnesses, resolve evidentiary conflicts, and draw reasonable inferences from proven facts." *United States v. Bernhardt*, 840 F.2d 1441, 1448 (9th Cir. 1988). Additionally, a district court may find that "circumstantial evidence and inferences drawn from it" are sufficient to sustain a conviction. *United States v. Reyes-Alvarado*, 963 F.2d 1184, 1188 (9th Cir. 1992), *as amended* (June 15, 1992).

---

[3] In the Government's consolidated opposition, the Government made an unopposed request to file a single 32-page opposition to Adriana Shayota's motions rather than filing two largely overlapping oppositions of 25 pages each. ECF No. 328, at 31. The Court hereby GRANTS this motion.

United States District Court
Northern District of California

### B. Motion for a New Trial

Federal Rule of Criminal Procedure 33 allows a court to "vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). The burden of justifying a new trial rests with the defendant. *See United States v. Shaffer*, 789 F.2d 682, 687 (9th Cir. 1986). The decision to grant a new trial is within the sound discretion of the trial court. *See United States v. Love*, 535 F.2d 1152, 1157 (9th Cir. 1976), *cert. denied*, 429 U.S. 847 (1976).

## III.    DISCUSSION

Before the Court are Adriana Shayota's motion for judgment of acquittal, ECF No. 499, Adriana Shayota's motion for a new trial, ECF No. 500, and Joseph Shayota's motion for a new trial, ECF No. 501. The Court first considers Adriana Shayota's motion for judgment of acquittal. The Court then considers Adriana Shayota's and Joseph Shayota's motions for a new trial together, because the issues raised in these motions overlap substantially.

### A. Adriana Shayota's Motion for Judgment of Acquittal

Adriana Shayota argues that the Court should enter a judgment of acquittal under Rule 29 because the evidence that the Government presented was insufficient to sustain a guilty verdict. Specifically, Adriana Shayota argues that the evidence that the Government produced at trial was insufficient to show that "Ms. Shayota knowingly and willfully joined the charged conspiracies." ECF No. 499, at 3. Adriana Shayota claims that the Government "principally relied on three pieces of evidence." *Id.*

First, the Government produced evidence showing that Justin Shayota emailed an invoice to Adriana Shayota at the request of Walid Jamil for 503 "cases" as well as "[t]rucking labels supplies ink for rest of orders." Transcript 11/14/16 at 53–54; Government's Exhibit 200. Although Adriana Shayota did not testify at trial, in her December 6, 2012 deposition testimony that was introduced at trial Adriana Shayota claimed that Justin Shayota sent this invoice to her by mistake and that she confronted Justin Shayota about the alleged mistake during a phone call. Ex. A to ECF No. 500 at 219–22 (Adriana Shayota Deposition Transcript). At trial, Justin Shayota testified that he did not remember any such telephone conversation. Moreover, Justin Shayota

testified that he was close to Adriana Shayota, who "was sort of looking out for [Justin] as [he] grew up." Transcript 11/14/16 at 118. Thus, Justin was likely to have remembered a telephone conversation in which Adriana Shayota "snapp[ed]" at him it if happened. Transcript 11/22/16 at 99.

Second, the Government produced evidence showing that Adriana Shayota emailed from and to herself an Excel spreadsheet entitled "Wally.xlxs." *Id.* at 177. The spreadsheet contained the heading "5HR," which Adriana Shayota concedes in her motion "mean[t] 5-Hour Energy." ECF No. 499, at 4. The spreadsheet listed several wire transfers that Adriana Shayota made from Baja Exporting to Walid Jamil's company, Midwest, and Justin Shayota's company, JT Wholesale, for "payroll," "equipment," and "boxes cost." *Id.* In total, the spreadsheet reflected more than $500,000 in wire transfers that Adriana Shayota admitted that she made to Walid Jamil and Justin Shayota. As discussed above, Adriana Shayota was the owner of Baja Exporting and was in charge of all wire transfers and accounting tasks. Additionally, as discussed above, Walid Jamil hired MCR to manufacture counterfeit boxes, and Justin Shayota, through JT Wholesale, labeled and packaged the counterfeit 5-Hour ENERGY. Thus, the Government argued that a spreadsheet reflecting over $500,000 in wire transfers for expenses related to "payroll," "equipment," and "boxes" constituted evidence that Adriana Shayota knew of and participated in the 5-Hour ENERGY conspiracies. However, Adriana Shayota testified in her deposition that she made this spreadsheet at the request of Walid Jamil and did not know what the entries meant. *Id.* at 5.

Third, the Government produced evidence showing that after Adriana Shayota learned that Living Essentials had sued other entities with whom Baja Exporting did business for the sale of relabeled and counterfeit 5-Hour ENERGY, Adriana Shayota wired $2,000,000 from Baja Exporting to a Baja Foodservice bank account in Mexico. ECF No. 500-1, at 4. In her deposition, Adriana Shayota admitted that she could not recall any other time that she had wired such a large, round amount of money to pay invoices. *Id.* at 6.

Adriana Shayota argues that this evidence is insufficient to support a guilty verdict and

United States District Court
Northern District of California

instead is "mere suspicion or speculation." ECF No. 499, at 3 (citing *United States v. Hernandez-Orellana*, 539 F.3d 994, 1004 (9th Cir. 2008)). However, as the Government points out in its opposition, this was not the only evidence against Adriana Shayota. Specifically, the Government points to three other important pieces of evidence.

First, the Government points out that in addition to transferring $2,000,000 to a Mexican bank account, Adriana Shayota's deposition testimony demonstrates that after learning of the 5-Hour ENERGY lawsuit, Adriana Shayota drained the Baja Exporting bank account from $2,900,000 to $0. ECF No. 500, Ex. A, at 58. Nevertheless, in her deposition testimony, Adriana Shayota insisted that draining the bank account "ha[d] nothing to do with" the 5-Hour ENERGY litigation. *Id.* at 60. Additionally, Adriana Shayota was removed as a signatory on the Baja Foodservice bank account in Mexico around the time that $2,000,000 was transferred to that account. ECF No. 500, Ex. A, at 54, 58.[4]

Second, in her deposition, Adriana Shayota stated that from July 2011 to January 2012, she loaned Walid Jamil $1,525,000 "to assist him in financially getting on his feet." ECF No. 500, Ex. A, at 117. However, this loan was never listed on any personal financial statements or other documents, and there was no written indication of an obligation to repay the loan or pay interest. *Id.* at 117–20. In closing arguments, even Adriana Shayota's attorney, Joseph McMullen, admitted that Adriana Shayota lied when she claimed this was a personal loan. T. 11/22/16 at 108 ("Wow, if they're handing out million and a half dollar checks to get back on their feet, then sign me up,

---

[4] In the Government's closing argument, the Government stated that Adriana Shayota had been removed as signatory on the Baja Foodservices account before Adriana Shayota made the $2,000,000 wire transfer. T.11/22/17, at 125 ("She's no longer the signatory on the Baja Foodservices account. Then the transfer goes."). However, in her civil deposition testimony that was introduced at the criminal trial, when Adriana Shayota was asked whether "this transfer [was] made before, or after you learned that you were no longer a signatory on the Baja Foodservice account," Adriana Shayota answered, "Before." Ex. A, at 54. This question and answer are ambiguous as to whether the transfer was made before or after Adriana Shayota was removed as the signatory. Thus, it is not clear whether Adriana Shayota was removed as signatory on the Baja Foodservices account before or after the transfer was made. However, resolving this issue is not necessary, because regardless of whether Adriana Shayota was removed as signatory before or after the transfer was made, the fact that Adriana Shayota was removed as signatory around the time of the transfer suggests that the purpose of the transfer and her removal as signatory was to protect the $2,000,000 from Living Essentials.

11

right?"). Instead, McMullen argued that this loan had something to do with Walid Jamil's new business venture called Green Health. *Id.* McMullen did not explain why Adriana Shayota would lie about investing in Green Health.

Third, in her deposition testimony, Adriana Shayota admits that she gave Walid Jamil a large number of Spanish-labeled bottles of 5-Hour ENERGY and that Walid Jamil later gave her the same number of bottles, in the same flavors, with English labels. *Id.* at 185–86. At trial, Joseph Shayota's attorney argued that this one-for-one correspondence was unremarkable because Joseph and Adriana Shayota merely "swapped" the Spanish bottles for the English bottles. *Id.* at 80 ("They swapped and they got back the exact amount of product that they swapped."). There was evidence that Living Essentials did not authorize Baja Exporting to sell Spanish label 5-Hour ENERGY in the United States and that Spanish label 5-Hour ENERGY was less valuable than English label 5-Hour ENERGY. However, McMullen argued in closing that Walid Jamil exchanged English label bottles for Spanish label bottles because he planned to "lose a little money up front" to the Shayotas to induce them to enter into Walid Jamil's "con." *Id.* at 110 ("He's doing that because that's the first step of the con, okay? He doesn't need to make money on that first step because there's big money to be made in the second step.").

However, this evidence of a swap was contradicted by other evidence introduced at trial. Specifically, Defense Exhibit E is an email from Andres Camberos, Adriana Shayota's brother, to Rob McCormack, the head of international sales for Living Essentials. Ex. E. In this email, Camberos stated that Baja Exporting was having trouble selling Spanish-labeled 5-Hour ENERGY in Mexico and therefore Camberos proposed three options to deal with the 1,648 cases that Baja Exporting still had in inventory:

1) You pick up the remaining cases in inventory and return the monies we wired for the product.

2) You exchange the product with fresh product, so that we have another 24 months to move through the inventory

3) If you do not agree with options (1) or (2), then our only choice would be to

Case No. 15-CR-00264-LHK
AMENDED ORDER DENYING MOTIONS FOR NEW TRIAL AND JUDGMENT OF ACQUITTAL

United States District Court
Northern District of California

sticker the product and sell it in the U.S. Ex. E.

The defense also introduced evidence that "sticker the product" meant relabeling the product. Specifically, the defense introduced another email from Camberos to McCormack in which Camberos stated that there was a mistake on the labels for some of the bottles of 5-Hour ENERGY, and therefore Camberos stated that "we now may have to sticker each unit" to correct the mistake. Ex. JJJ.

Thus, it is clear from these defense exhibits that Baja Exporting intended to relabel the Spanish-labeled bottles with English labels and sell them in the United States. Indeed, while cross-examining McCormack, the defense suggested that McCormack "knew exactly" what stickering meant and knew that Baja Exporting planned to relabel the bottles. T.10/25/16, at 166–69. In light of this evidence, Adriana Shayota's later argument that Baja Exporting did not relabel the Spanish-labeled bottles but instead "swapped" them with Walid Jamil for English-labeled bottles was not credible.

Together, this evidence is more than sufficient to support the jury's conclusion that Adriana Shayota knew of and agreed to the conspiracies to distribute relabeled, and to manufacture and distribute counterfeit, bottles of 5-Hour ENERGY. Much of the evidence was based on suspicious transactions and communications and Adriana Shayota's implausible explanations of these transactions and communications. For example, in her December 6, 2012 deposition testimony that was read at trial, Adriana Shayota claimed that Justin Shayota incorrectly sent her an invoice related to the conspiracies. However, Justin Shayota denied that he sent the invoice by mistake and denied that Adriana Shayota claimed that the invoice was sent by mistake. If the jury chose to credit Justin Shayota's testimony, then the jury would have found Adriana Shayota's claim that she received the invoice by mistake to be false and to be evidence of Adriana Shayota's knowledge of the conspiracies.

Additionally, the jury may rationally have chosen not to credit Adriana Shayota's explanation for wiring $2,000,000 from Baja Exporting to the Baja Foodservices account in Mexico and draining the $2,900,000 Baja Exporting account to $0 after learning of the lawsuit by

Living Essentials. In addition, Adriana Shayota was removed from the Baja Foodservices account in Mexico before the $2,000,000 was transferred to that account. The jury may have concluded that the timing and amount of the wire transfer, the fact that Adriana Shayota was removed as a signatory to the Mexican bank account, as well as the draining of the $2,900,000 account, indicated that Adriana Shayota was not simply paying an invoice but was instead trying to remove money from Baja Exporting before Living Essentials sued Baja Exporting for its role in the conspiracies to sell relabeled and counterfeit 5-Hour ENERGY. This in turn would support an inference that Adriana Shayota knew of and agreed to the conspiracies.

Furthermore, the jury could rationally have disbelieved Adriana Shayota's explanations of the "swap" of Spanish and English bottles and the $1,525,000 loan to Walid Jamil. As discussed above, Adriana Shayota's account of the "swap" was contradicted by the defense's earlier evidence that McCormack knew that Baja Exporting would relabel the Spanish-labeled bottles with English labels. Additionally, as discussed above, Adriana Shayota's explanation of the $1,525,000 loan to Walid Jamil was so incredible that her attorney disavowed the explanation in his closing argument. If the jury disbelieved Adriana Shayota's explanations of these matters, the jury could rationally have inferred that Adriana Shayota knew of and agreed to the conspiracies.

It also would have been rational for the jury not to credit Adriana Shayota's claim that she did not know the meaning of the Excel spreadsheet that she emailed from and to herself. In her deposition testimony, Adriana Shayota claimed that Walid Jamil simply told her to write down certain numbers and that Adriana Shayota did not know what the numbers meant. However, the jury could rationally have concluded that Adriana Shayota was not telling the truth in her deposition testimony and that she actually knew that the numbers in the spreadsheet referred to expenses related to the 5-Hour ENERGY conspiracies. Such a conclusion is particularly justified because Adriana Shayota's explanation was seemingly inconsistent with Adriana Shayota's theory that Walid Jamil concealed the 5-Hour ENERGY relabeling and counterfeiting from Joseph and Adriana Shayota. If Walid Jamil were attempting to conceal the 5-Hour ENERGY relabeling and counterfeiting from Joseph and Adriana Shayota, it is unlikely that Walid Jamil would have

dictated the detailed expenses of the conspiracies for Adriana Shayota to enter on a spreadsheet. If the jury had chosen to disbelieve Adriana Shayota's explanation, this would have strongly supported the jury's finding that Adriana Shayota knew of and agreed to the conspiracies.

Finally, it is significant that the jury was not required to find that Adriana Shayota had actual knowledge that Living Essentials had not authorized her to reproduce 5-Hour ENERGY trademarks or copyrights. Instead, the jury could have convicted Adriana Shayota based on a finding that she was deliberately ignorant that she did not have authorization to reproduce 5-Hour ENERGY trademarks and copyrights. Specifically, as part of the final jury instructions, the Court gave the following instruction to the jury:

> You may find that the defendant acted knowingly if you find beyond a reasonable
>
> doubt that the defendant:
>
> > 1. was aware of a high probability that he or she was not authorized to
> >
> > reproduce 5-Hour ENERGY trademarks or copyright owned by Living
> >
> > Essentials and reproduced 5-Hour ENERGY trademarks or copyright
> >
> > owned by Living Essentials; and
> >
> > 2. deliberately avoided learning the truth."
>
> You may not find such knowledge, however, if you find that the defendant
>
> actually believed that he or she was authorized to use Living Essentials' 5-Hour
>
> ENERGY trademarks or copyright, or if you find the defendant was simply
>
> careless."

ECF No. 453, at 22; *see also United States v. Anderson*, 741 F.3d 938, 948 (9th Cir. 2013) (finding that recklessness or willful blindness theories are valid for establishing the willfulness element in a criminal copyright case). Thus, the jury could have sustained its guilty verdict against Adriana Shayota in part by a finding that Adriana Shayota was deliberately ignorant of the fact that she did not have authorization to reproduce 5-Hour ENERGY trademarks and copyrights.

If the jury did not believe Adriana Shayota's explanations of certain pieces of evidence, the most likely alternative explanation was that Adriana Shayota knew of and agreed to at least one of

15

the objects of the conspiracies. ECF No. 453, at 24. In deciding a Rule 29 motion, a court should be mindful that "it is the jury's exclusive function to determine the credibility of witnesses, resolve evidentiary conflicts, and draw reasonable inferences from proven facts." *Bernhardt*, 840 F.2d at 1448. Additionally, although much of the evidence against Adriana Shayota was circumstantial, the Ninth Circuit has held that "circumstantial evidence and inferences drawn from it may be sufficient to sustain a conviction." *Reyes-Alvarado*, 963 F.2d at 1188. Considered as a whole, therefore, the evidence that the Government produced at trial was more than sufficient to sustain the guilty verdict against Adriana Shayota.

For these reasons, the Court DENIES Adriana Shayota's motion for judgment of acquittal.

## B. Joseph and Adriana Shayota's Motions for a New Trial

Both Joseph and Adriana Shayota move for a new trial. Under Rule 33, the Court may order a new trial "if the interest of justice so requires." Fed. R. Crim. P. 33(a). Joseph and Adriana Shayota move for a new trial on several grounds. First, Adriana Shayota claims that her trial counsel rendered ineffective assistance of counsel. Second, both Joseph and Adriana Shayota argue that the redactions to their deposition testimony were insufficient under *Bruton v. United States*, 391 U.S. 123 (1968). Third, both Joseph and Adriana Shayota argue that admitting the deposition testimony of Walid Jamil and Leslie Roman against them violated their rights under the Confrontation Clause and under Federal Rule of Evidence 802. Fourth, both Joseph and Adriana Shayota argue that juror misconduct violated their Sixth Amendment right to a fair and impartial jury. Fifth, both Joseph and Adriana Shayota argue that the Government violated Defendants' Fifth Amendment due process rights under *Napue v. Illinois*, 360 U.S. 264 (1959), because the Government failed to correct false testimony at trial. Sixth, Adriana Shayota argues that the jury's verdict was against the weight of the evidence and that in light of all the circumstances, the interests of justice require a new trial. The Court considers each of these arguments in turn.

### 6. Ineffective Assistance of Counsel

Adriana Shayota argues that her trial counsel, Joseph McMullen, rendered ineffective assistance of counsel because McMullen failed to discover and present evidence that Adriana

Shayota had been advised that it was lawful to wire $2,000,000 from Baja Exporting to Baja Foodservice. Specifically, Adriana Shayota claims that on October 30, 2012, after learning of the lawsuit regarding 5-Hour ENERGY, Joseph and Adriana Shayota retained attorney Gregory Vega and his firm, Seltzer Caplan McMahon Vitek ("SCMV"), to represent Baja Exporting and the Shayotas personally. In a declaration filed along with her motion for a new trial, Adriana Shayota claims that at the beginning of November 2012, Adriana Shayota asked Vega whether it was legal for her to transfer funds from Baja Exporting to pay "a number of bills." Declaration of Adriana Shayota, ECF No. 500-2, ¶ 3. Adriana Shayota does not claim that she ever told Vega that she intended to wire $2,000,000 to the Baja Foodservices account in Mexico, that she intended to drain Baja Exporting's bank account from $2,900,000 to $0, or that she would be removed as signatory on the Baja Foodservices account in Mexico around the time of the $2,000,000 transfer.

In her declaration, Adriana Shayota claims that Vega informed her that she could transfer funds as long as there was no freezing order prohibiting her from doing so. Adriana Shayota also states that Vega facilitated a wire transfer from Baja Exporting to SCMV, which "confirmed for [Adriana Shayota] that he saw no legal impediment to making such transfers." *Id.* ¶ 4. Relying on this advice, Adriana Shayota states that she made the $2,000,000 transfer between Baja Exporting and Baja Foodservice on November 2, 2012. *Id.* ¶ 5.[5]

Vega also filed a declaration in which he states that on either October 30, 2012, October 31, 2012, November 1, 2012, or November 2, 2012, Adriana Shayota "asked [Vega] if there was any issue with Baja paying its vendors." ECF No. 500-3, at ¶ 3. Vega states that he responded that he was "unaware of any legal prohibition on Baja Exporting paying its vendors from funds in Baja Exporting's bank account. *Id.* ¶ 4.

Subsequently, after Joseph and Adriana Shayota were indicted in the instant criminal case,

---

[5] Based on Vega's contemporaneous notes, the Government argues that it is likely that the conversation between Vega and Adriana Shayota about the transfer of money in fact occurred after the November 2, 2012 wire transfer. ECF No. 528, at 20. However, because the Court finds that Adriana Shayota suffered no prejudice even assuming that Vega gave his advice before November 2, 2012, the Court need not address this factual issue.

Case No. 15-CR-00264-LHK
AMENDED ORDER DENYING MOTIONS FOR NEW TRIAL AND JUDGMENT OF ACQUITTAL

Vega referred Adriana Shayota to McMullen because SCMV determined that it could not represent both Joseph Shayota and Adriana Shayota in the criminal case. *Id.* ¶ 10. Adriana Shayota retained McMullen and "told him on several occasions" that Vega had advised her that the November 2, 2102 wire transfer was lawful. *Id.* ¶ 11. McMullen also filed a declaration regarding the incident, and McMullen claims that when McMullen and Adriana Shayota "discussed the two-million-dollar wire transfer during our pretrial meetings, she told me words to the effect of Mr. Vega said that the wire transfer was okay." ECF No. 500-3, at ¶ 8. However, as discussed above, Adriana Shayota never claims that she told Vega about the $2,000,000 transfer. ECF No. 500-2, at ¶ 3. Instead, Adriana Shayota claims that she simply asked Vega generally whether Baja Exporting could "pay the bills." *Id.*

McMullen states that he "assumed" from his conversation with Adriana Shayota that Vega had told her that the $2,000,000 wire transfer was legal after Adriana Shayota made the wire transfer. McMullen Declaration, ECF No. 500-4, ¶ 9. McMullen also states that if he had known that Vega gave the advice before the wire transfer, he would have called Vega as a witness at trial. *Id.* ¶ 12.

A claim of ineffective assistance of counsel is governed by the two-part test set forth in *Strickland v. Washington*, 466 U.S. 668, 687 (1984). To prevail on such a claim, a defendant must show: (1) that counsel's representation fell below the range of competence demanded of attorneys in criminal cases; and (2) that the defendant was prejudiced by counsel's representation. The reviewing court must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. In order to demonstrate prejudice, Defendant must "show that there is a reasonable probability that but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. Courts may address the two prongs of the Strickland test in whichever order is most efficient and need not address one prong if the other prong is lacking. *Id.* at 697. However, the United States Supreme Court has stated that "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." *Strickland*, 466 U.S.

United States District Court
Northern District of California

at 697.

In the instant case, Adriana Shayota has not sufficiently demonstrated that she was prejudiced by her trial counsel's alleged errors. Adriana Shayota argues that the Government emphasized the $2,000,000 wire transfer as evidence of Adriana Shayota's consciousness of guilt, and "[t]estimony from Mr. Vega that Ms. Shayota had consulted him about the transfer and followed his advice would have rebutted the inference the government asked the jury to draw." ECF No. 500, at 7. However, the inference that the Government asked the jury to draw did not rely on the wire transfer being illegal. Indeed, the Government never claimed at trial that the wire transfer itself was illegal. To the contrary, in closing the Government acknowledged that there was no freezing order at the time of the $2,000,000 transfer and noted that "what happened there is exactly why accounts need to be frozen." T.11/22/16 at 125. In his closing argument on behalf of Adriana Shayota, McMullen also noted that Baja Exporting was not subject to a freeze at the time of the $2,000,000 transfer. T.11/22/16 at 101. The Government went on to argue that even if the money went to pay verifiable debts, that does not excuse the fact that the money was obtained from selling relabeled and counterfeit 5-Hour ENERGY. The Government also noted that Adriana Shayota was removed as signatory of the Baja Foodservice bank account in Mexico around the time of the $2,000,000 wire transfer, which was further evidence that the purpose of the wire transfer was to move the money to an account that was less likely to be frozen. *Id.* Additionally, the Government pointed out that not only did Adriana Shayota transfer $2,000,000, Adriana Shayota "zeroed out" Baja Exporting's $2,900,000 "business account." T.11/22/16 at 62.

Thus, Vega's advice does not undermine the conclusion that the reason that Adriana Shayota transferred the money was to remove ill-gotten gains from Baja Exporting's account. Indeed, the jury may have drawn a stronger adverse inference if it heard that Adriana Shayota asked Vega only whether it was legal to transfer funds from Baja Exporting to pay "a number of bills," ECF No. 500-2, at ¶ 3, and did not inform Vega that she planned to transfer an even $2,000,000 from Baja Exporting's account in the United States to Baja Foodservice's account in Mexico, that around the time of the transfer she would removed as a signatory on the Baja

United States District Court
Northern District of California

Foodservice account, or that she planned to drain Baja Exporting's account from $2,900,000 to $0.

In support of her argument that McMullen rendered ineffective assistance of counsel, Adriana Shayota cites the Ninth Circuit's decision in *Vega v. Ryan*, 757 F.3d 960 (9th Cir. 2014). In *Vega*, the defendant had been convicted of child molestation and sexual abuse. *Id.* at 962. The primary evidence against the Defendant was the victim's allegation of sexual abuse. At trial, the victim testified that she had recanted one set of allegations to her mother. *Id.* However, the defendant's counsel failed to present evidence that the victim had also recanted to her priest. *Id.* The Ninth Circuit found that this failure was prejudicial because recantation to a priest was powerful supporting evidence because unlike the victim's mother, the priest had no "reason to want [the victim] to recant." *Id.* at 973.

Adriana Shayota claims that as in *Vega*, the evidence that an attorney told Adriana Shayota that wiring money was legal "would have added an entirely new dimension to the jury's assessment" of the testimony. *Id.* at 974. However, in *Vega* the Ninth Circuit emphasized that the priest's testimony would have gone "squarely to the core issue in the case: Was [the victim] telling the truth about Vega." *Id.* at 973. In contrast, in the instant case the evidence that was omitted was "only a small part of the mosaic of trial testimony" regarding Adriana Shayota's credibility and consciousness of guilt, and Adriana Shayota makes no effort to explain how the evidence that an attorney told Adriana Shayota that wiring money was legal would have rebutted the Government's argument that even if the transfer was legal, it nevertheless indicated consciousness of guilt. *Jones v. Ryan*, 691 F.3d 1093, 1104 (9th Cir. 2012).

Additionally, in *Vega* the Ninth Circuit noted that prejudice was evident because "the jury had a difficult time reaching a verdict." *Vega*, 757 F.3d at 962, 974. Specifically, the jurors could not reach a unanimous verdict on three of the eight counts against the defendant. *Id.* at 975. In the instant case, in contrast, the jury deliberated for approximately 9 hours and 25 minutes in a complex case before unanimously finding Adriana and Joseph Shayota guilty on both counts. Therefore, unlike in *Vega*, there is no indication that the jury had a difficult time reaching a verdict. Thus, *Vega* does not support Adriana Shayota's argument that she suffered prejudice from

United States District Court
Northern District of California

her counsel's alleged errors.

In short, the fact that Adriana Shayota believed that transferring money from Baja Exporting was legal does not undermine the argument that transferring $2,000,000 from one Baja entity to another around the time that she was removed as signatory on the account receiving the $2,000,000 and draining the Baja Exporting account from $2,900,000 to $0 indicates consciousness of guilt. Thus, Adriana Shayota has not shown "a reasonable probability that but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. Therefore, Adriana Shayota has failed to establish that her counsel's alleged errors prejudiced her case. Because the Court finds that Adriana Shayota has failed to establish prejudice, the Court need not consider whether her attorney's representation fell below the objectively reasonable range of competence. The Court therefore DENIES Adriana Shayota's motion for a new trial based on ineffective assistance of counsel.

### 7. *Bruton* Redactions

Joseph and Adriana Shayota both argue that admission of the other's deposition violated their rights under the Confrontation Clause. Before describing Joseph and Adriana Shayota's arguments in detail, it is necessary to discuss the relevant procedural history.

Both Joseph and Adriana Shayota gave deposition testimony in the civil case of *Innovation Ventures, LLC and Living Essentials, LLC. v. Ultimate One Distributing Corp., et al.*, 12-CV-5354 (KAM) ("*Ultimate* Action"), which related to the same subject matter as the instant criminal case. Joseph Shayota gave deposition testimony on December 5, 2012, and Adriana Shayota gave deposition testimony on December 6, 2012. On October 19, 2016, the Court ruled that Adriana Shayota's deposition testimony was admissible against Adriana Shayota and that Joseph Shayota's deposition testimony was admissible against Joseph Shayota as opposing party statements under Federal Rule of Evidence 801(d)(2). However, although Joseph and Adriana Shayota had not raised the issue, the Court also held that "[t]o the extent the Government seeks to introduce an admission or statement of a party opponent that references a co-defendant at trial, the Government must redact those statements in accordance with *Bruton v. United States*, 391 U.S. 123 (1968), and

its progeny." ECF No. 331, at 21. The Court ordered the parties to meet and confer about the redactions and to "file a joint statement that identifies areas of agreement and disagreement regarding redactions and any limiting instructions." ECF No. 350.

Adriana Shayota's deposition testimony mentioned Joseph Shayota, and Joseph Shayota's deposition testimony mentioned Adriana Shayota. Therefore, before admitting either deposition into evidence at the joint trial of Joseph and Adriana Shayota, the parties met and conferred on redactions to the transcripts. On November 11, 2016, the parties filed a document stating that "the parties have resolved any areas of disagreement regarding Adriana Shayota's December 6, 2012 deposition." ECF No. 423, at 1. On November 14, 2016, the parties filed a document stating that "without waiving any prior objections or motions regarding severance that the Court has already ruled on, the parties have resolved any areas of disagreement regarding Joseph Shayota's December 5, 2012 deposition." ECF No. 428, at 1.

In their motions for a new trial, however, Joseph and Adriana Shayota argue for the first time that the redactions were insufficient because the redactions made it obvious that the transcripts had been altered and that "the person whose identity was protected in Joseph Shayota's deposition was Adriana Shayota, and in Adriana Shayota's deposition it was Joseph Shayota." ECF No. 500, at 10. Specifically, Joseph and Adriana Shayota argue that the use of the phrase "the other person" or similar language was awkward and in some places clearly stood in for a proper name. *Id.* Additionally, Joseph and Adriana Shayota argue that in some lines containing redactions, the font size was changed slightly, which further indicated that a change had been made.

However, under a Rule 33 motion for a new trial, in the absence of plain error "[a] defendant's failure to object to an alleged error generally precludes him from asserting the claimed error in a motion for new trial." *United States v. McBride*, 862 F.2d 1316, 1319 (8th Cir. 1988); *see also Mitchell v. Black & Decker (USA) Inc.*, 6 F. App'x 652, 653 (9th Cir. 2001) ("Because Mitchell failed to object to any of these statements before the case went to the jury, he waived his objections to them, absent a showing of gross injustice or an explanation of the failure to object.")

(unpublished). In the instant case, not only did Joseph and Adriana Shayota fail to object to the wording and style of the redactions, Joseph and Adriana Shayota conferred with the Government and filed a statement agreeing to the redactions to which they now object. *See* ECF No. 423, at 1 ("[T]he parties have resolved any areas of disagreement regarding Adriana Shayota's December 6, 2012 deposition."); ECF No. 428, at 1 ([W]ithout waiving any prior objections or motions regarding severance that the Court has already ruled on, the parties have resolved any areas of disagreement regarding Joseph Shayota's December 5, 2012 deposition.").

"Counsel cannot stand idly by, permit the presentation of erroneous matter at trial, and then complain about the inclusion of that evidence in the trial record, absent plain error." *McBride*, 862 F.2d at 1319. However, that is exactly what happened in the instant case. Joseph and Adriana Shayota initially argued broadly that introducing any deposition testimony from the civil proceedings violated their rights under the Confrontation Clause. The Court agreed that introduction of Joseph and Adriana Shayota's testimony against each other would violate the Confrontation Clause, and therefore to address this issue the Court gave the following limiting instructions to the jury:

> You heard deposition testimony given by Joseph Shayota on December 5, 2012. I instruct you that this evidence is admitted for the limited purpose of reaching a verdict as to Joseph Shayota, and therefore, you must consider it only for that limited purpose and not for any other purpose. ECF No. 453, at 15.
> You heard deposition testimony given by Adriana Shayota on December 6, 2012. I instruct you that this evidence is admitted for the limited purpose of reaching a verdict as to Adriana Shayota, and therefore, you must consider it only for that limited purpose and not for any other purpose. ECF No. 453, at 16.

The Court also ordered that the parties meet and confer on redactions pursuant to *Bruton*. ECF No. 350. Joseph and Adriana Shayota agreed to both the limiting instructions read to the jury and the redactions used at trial.

However, even if Joseph and Adriana Shayota had objected to the proposed redactions at

the time, the Court would have found that the redactions were sufficient. As discussed above, Joseph and Adriana Shayota claim that the wording and font size of the redactions made it obvious that a particular name was being replaced. Specifically, in the depositions of both Joseph and Adriana Shayota, each instance of the name was replaced by the phrase "the other person," "another person," or similar phrases. ECF No. 500, at 10; *see also, e.g.*, ECF No. 500-1, at 117. The Government also changed the font size of some redactions to fit the new phrase onto the same line. In perhaps the most extreme example of a change in font size, the following redaction was made to page 195 of Joseph Shayota's deposition:

```
13        Q     And what document would show the deduction from
14   the payments?
15        A     I believe the other person had it somewhere. You will
16   ask them tomorrow.   They will answer that question. But
17   Mr. Kevin knows this money will be deducted, because
18   even Fadi tell me, Joe, how much left, please.   Just
```

Joseph and Adriana Shayota argue that because of the phrasing and changes in font size, "[n]o juror could have failed to notice that the phrase . . . had been inserted to replace a specific name that had originally appeared in the transcript." ECF No. 500, at 11. Joseph and Adriana Shayota argue that under *Gray v. Maryland*, 523 U.S. 185 (1998), and its progeny, these redactions were insufficient. However, none of the cases that Joseph and Adriana Shayota cite provide support for their position.

In *Gray v. Maryland*, the United States Supreme Court held that certain redactions so obviously point an incriminating finger at a co-defendant that they are insufficient to protect the co-defendant's rights under the Confrontation Clause. However, the facts of the instant case are very different from the facts in *Gray*. In *Gray* the Government made no attempt at all to conceal the fact that deletions had been made – indeed, the name of the co-defendant was replaced only with the word "deleted." *Id.* at 196. Additionally, and perhaps most importantly, *Gray* involved a two-defendant criminal case in which a confession by a co-defendant "powerfully incriminat[ed]"

the other co-defendant. *Id.* at 192. In contrast, as discussed further below, the redactions in the instant case were made with a neutral phrase and the depositions were not "powerfully incriminating," because Joseph and Adriana Shayota did not blame each other in their deposition testimony, but instead blamed other co-defendants such as Walid Jamil and Justin Shayota. *Id.*

Joseph and Adriana Shayota also cite *United States v. Parks*, 285 F.3d 1133 (9th Cir. 2002), in which the Ninth Circuit found that references to multiple participants in a bank robbery violated *Bruton* because the references could only reasonably have included the co-defendant. However, as in *Gray*, the statement in *Parks* was directly and strongly incriminatory. In contrast, as discussed further below, the redactions in the instant case did not all obviously refer to the same co-defendant, and the statements were not strongly incriminatory.

In *United States v. Peterson*, 140 F.3d 819 (9th Cir. 1998), another case that Joseph and Adriana Shayota cite, the Government used the phrase "person X" rather than a neutral phrase. In *Peterson*, the Court also gave no limiting instruction to the jury, and in closing argument the Government explicitly argued that the co-defendant was the "person X" referred to in the confession. *Id.* at 820. In contrast, in the instant case the redactions were made using a neutral phrase and the Court instructed the jury to consider the deposition testimony of Adriana Shayota only against Adriana Shayota and to consider the deposition testimony of Joseph Shayota only against Joseph Shayota.

Joseph and Adriana Shayota also cite *United States v. Gillam*, 167 F.3d 1273 (9th Cir. 1999), in which the Ninth Circuit found that a descriptive phrase identifying someone who "worked at the FDA" and was "getting ready to retire" was an insufficient redaction. However, the Ninth Circuit also noted that "[t]he impact of the indirect reference . . . was not so devastating that the jury could not be expected to follow the judge's admonition to consider the statement only against Gillam." *Id.* at 1277. The *Gillam* Court found that the error was harmless beyond a reasonable doubt. Similarly, in the instant case the testimony was not "powerfully incriminating," *Gray*, 523 U.S. at 192, but instead was at most a harmless "indirect reference," *Gillam*, 167 F.3d at 1277.

United States District Court
Northern District of California

In the instant case, unlike the redactions in *Gray*, *Peterson*, and *Gillam*, the Government integrated the neutral phrase "another person" into the grammar of each sentence. Indeed, in order to ensure that the redactions were as smooth as possible, the Government met and conferred with Joseph and Adriana Shayota, who agreed to the redactions. Additionally, unlike *Gray*, *Park*, and *Peterson*, the statement in the instant case was not a confession. Indeed, in both depositions Joseph and Adriana Shayota strenuously denied any wrongdoing. In the instant case neither Joseph nor Adriana Shayota confessed, and in fact their defense at trial and in civil depositions was to blame others, including Walid Jamil and Justin Shayota. Thus, even if some of the redactions were imperfect, they did not constitute "powerfully incriminating" evidence against a particular co-defendant. *Gray*, 523 U.S. at 192.

Additionally, as the Government points out, even if the jury could infer that redactions were made and that some redactions referred to Joseph or Adriana Shayota, the jury had no reason to believe that the redactions all referred to the same person. As discussed above, Joseph and Adriana Shayota's strategy at trial and in civil depositions was to assign blame to other co-defendants, including Walid Jamil and Justin Shayota. In total, the Superseding Information in the instant case named eleven defendants, and the factual circumstances involved several other actors as well. ECF No. 169. Thus, even if the redactions did incriminate a co-defendant, the jury had no reason to believe that each redaction referred to Joseph or Adriana Shayota, as opposed to referring to Walid Jamil, Justin Shayota, or any of the other co-defendants. Therefore, a jury would have no reason to assume that each redaction referred to the same person.

Furthermore, in most cases the changes in font size are so small as to be unnoticeable. The Government matched the font of the words and matched the size of the text as closely as possible. Differences in typesetting between lines are common in word-processing software, and thus the small differences in font size were unlikely to have raised any juror's suspicion. Additionally, the primary testimony was oral; jurors were given the deposition transcripts only as aids to follow along during the oral reading. After the reading, the jurors returned the transcripts and never saw them again. This further reduces the risk of identification of co-defendants because of these small

changes in font size. Finally, even if jurors noticed the differences in font size and realized that redactions had been made, as discussed above, there were many defendants and other actors to which the redacted lines could have referred. Thus, the risk of specific identification of co-defendants because of changes in font size was small.

In short, the redactions made to the deposition testimony of Joseph and Adriana Shayota did not obviously "point an accusing finger" at a particular person. *Gillam*, 167 F.3d at 1277. Even if some of the redactions were awkward and allowed an inference that a co-defendant was named, this occurred in relatively few places and certainly did not constitute "powerfully incriminating" testimony against a co-defendant. *Gray*, 523 U.S. at 192. Thus, even if there was some error, the Court finds that the error was harmless beyond a reasonable doubt. *See Gillam*, 167 F.3d at 1277. Most importantly, the Court already gave Joseph and Adriana Shayota the opportunity to meet and confer with the Government regarding these issues, and Joseph and Adriana Shayota agreed to the redactions in question.

Additionally, as discussed above, the Court specifically instructed the jury to consider the deposition testimony of Adriana Shayota only against Adriana Shayota and to consider the deposition testimony of Joseph Shayota only against Joseph Shayota. "A jury is presumed to follow its instructions." *Weeks v. Angelone*, 528 U.S. 225, 234 (2000).

Therefore, the Court DENIES Joseph and Adriana Shayota's motions for a new trial based on the alleged flaws in the redactions to the deposition testimony of Joseph and Adriana Shayota.

### 8. Deposition Testimony of Walid Jamil and Leslie Roman

Joseph and Adriana Shayota argue that the admission of deposition testimony at their trial violated the Confrontation Clause and Federal Rule of Evidence 802. At trial, the Government introduced portions of the November 27, 2012 deposition of Walid Jamil in the action entitled *Innovation Ventures, LLC, et al. v. Ultimate One Distributing Corp., et al.*, E.D.N.Y. Case No. 1:12-CV- 05354-KAM-ST ("*Ultimate* Action"), against Joseph Shayota only;[6] the September 16,

---

[6] Before the Government read Walid Jamil's November 27, 2012 deposition testimony into evidence, the Court instructed the jury to consider the deposition testimony against Joseph

2013 deposition of Walid Jamil in the action entitled *Innovation Ventures, et al. v. Pittsburgh Wholesale Grocers Inc., et al.*, N.D. Cal. Case No. 3:12-CV-05523-WHA ("*Pittsburgh* Action"), against Joseph and Adriana Shayota; and the December 10, 2012 deposition of Leslie Roman in the *Ultimate* action against Joseph and Adriana Shayota. Although Joseph and Adriana Shayota focus primarily on the deposition testimony of Walid Jamil, Joseph and Adriana Shayota appear to object to the introduction of the deposition testimony of both Walid Jamil and Leslie Roman.

Joseph and Adriana Shayota recognize that the Court has already ruled that the introduction of Walid Jamil's deposition testimony against Joseph and Adriana Shayota did not violate either the Confrontation Clause or Federal Rule of Evidence 802. Joseph and Adriana Shayota also recognize that "the proper function of a Rule 33 motion is not to complain of prior adverse rulings made by the district court." ECF No. 501, at 1. However, Joseph and Adriana Shayota argue that because the Court's ruling was "novel and unusual" for allowing civil deposition testimony in a criminal proceeding, it is appropriate to request "reconsideration prior to an appeal" of the Court's earlier ruling. *Id.* at 13.

At the outset, the Court notes that the use of civil deposition testimony in a criminal proceeding is far from unique. *See United States v. Paling*, 580 F. App'x 144, 148 (3d Cir. 2014) (finding prior civil deposition admissible under the Confrontation Clause and under Federal Rule of Evidence 804(b)(1)); *Osio v. Taylor*, 2010 WL 3747741, at *2–5 (C.D. Cal. Aug. 17, 2010), *report and recommendation adopted*, 2010 WL 3747720 (C.D. Cal. Sept. 23, 2010) ("It is clear that during the deposition in the civil case Petitioner's counsel questioned Waters to uncover the basis for her claim that Petitioner had stolen the money. This is all the Constitution requires, i.e., that the defendant have the opportunity to confront and cross-examine the witness.").

However, in addition to this general objection to the use of civil deposition testimony, Joseph and Adriana Shayota object to the admission of the deposition testimony in this case for

---

Shayota only. T. 11/7/16 at 268 ("You are about to hear deposition testimony given by Walid Jamil on November 27, 2012. I instruct you that this evidence is admitted for the limited purpose of reaching a verdict as to Joseph Shayota, and therefore, you must consider it only for that limited purpose and not for any other purpose.").

United States District Court
Northern District of California

three specific reasons. First, Joseph and Adriana Shayota claim that they were denied their ability to confront their accusers face-to-face and that the jury was denied the opportunity to view the witnesses' demeanor. ECF No. 501, at 14–15. Second, Joseph and Adriana Shayota argue that they were denied the right to confront their accusers "with the assistance of unconflicted counsel" because "trial proceedings made it abundantly clear that Adriana and Joe Shayota had vastly divergent strategies and interests." *Id.* at 15. Third, Joseph and Adriana Shayota argue that they were denied their right to impeach and cross-examine the witnesses against them. *Id.* at 11–15.[7] The Court addresses these arguments in turn.

### a. Face to Face Confrontation and Demeanor

Joseph and Adriana Shayota first argue that they were denied their rights under the Confrontation Clause because the Confrontation Clause "guarantees the defendant a face-to-face meeting with witnesses appearing before the trier of fact" and "compel[s] [a witness] to stand face to face with the jury in order that they may look at him, and judge by his demeanor upon the stand and the manner in which he gives his testimony whether he is worthy of belief." *Coy v. Iowa*, 487 U.S. 1012, 1016, 1026 (1988) (quoting *Mattox v. United States*, 156 U.S. 237, 242–243 (1895)).

However, the Confrontation Clause does not require that a defendant actually confront the witnesses against him at the time of the criminal trial. Instead, "[t]he Confrontation Clause guarantees only 'an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish.'" *United States v. Owens*, 484 U.S. 554, 559 (1988) (emphasis in original) (quoting *Kentucky v. Stincer*, 482 U.S. 730, 739 (1987)); *see also United States v. Sines*, 761 F.2d 1434, 1441 (9th Cir. 1985) (denying a challenge to the introduction of deposition testimony when "Sines was given the opportunity to

---

[7] Joseph Shayota also argues that another "highly unusual aspect of this case" is that the Government could have procured Walid Jamil's availability but declined to do so for its own tactical benefit. ECF No. 501, at 15. However, Joseph Shayota does not argue that the Government's actions justify a new trial. Therefore, the Court need not consider this argument. Nevertheless, the Court notes that at Walid Jamil's sentencing hearing on April 26, 2017, Walid Jamil and his counsel stated that Walid Jamil had been adamant that he would not testify against any co-defendants in the instant case. ECF No. 587, at 7.

Case No. 15-CR-00264-LHK
AMENDED ORDER DENYING MOTIONS FOR NEW TRIAL AND JUDGMENT OF ACQUITTAL

attend [the declarant's] deposition, and chose not to attend"). Thus, contrary to Joseph and Adriana Shayota's argument, the issue is not whether Joseph and Adriana Shayota waived their rights under the Confrontation Clause. ECF No. 501, at 9. Instead, the issue is whether Joseph and Adriana Shayota had the opportunity to cross-examine the witnesses against them. *See Phillips v. Wyrick*, 558 F.2d 489, 496 (8th Cir. 1977) ("The controlling consideration is not whether [the defendant] effectively waived his right to cross-examine [the witness], but whether [the defendant] had an adequate opportunity to conduct a cross-examination of [the witness]."). If Joseph and Adriana Shayota had such an opportunity, then their Confrontation Clause rights were not violated.

As explained in the Court's October 19, 2016 order admitting the testimony of Walid Jamil, Joseph and Adriana Shayota had an opportunity to confront the witnesses against them. ECF No. 331, at 15–17. Joseph and Adriana Shayota received advance notice of the depositions of Walid Jamil and Leslie Roman during the civil litigation, Joseph and Adriana Shayota both had an opportunity to attend the depositions, and Joseph and Adriana Shayota's counsel attended each of the depositions and had the opportunity to cross-examine the deponents. Specifically, Joseph and Adriana Shayota have stated that Joseph and Adriana Shayota were represented at Walid Jamil's September 16, 2013 deposition. Joseph Shayota was represented at Walid Jamil's November 27, 2012 deposition, and this deposition was not introduced against Adriana Shayota. Joseph and Adriana Shayota were represented at Leslie Roman's December 10, 2012 deposition. ECF No. 296-1. Thus, Joseph and Adriana Shayota had ample opportunity to confront Walid Jamil and Leslie Roman.

Indeed, Joseph and Adriana Shayota's attorney in fact questioned both Walid Jamil and Leslie Roman. Specifically, in a deposition taken on October 30, 2013, Joseph and Adriana Shayota's attorney, Greeley, questioned Walid Jamil extensively as part of both the *Ultimate* and *Pittsburgh* actions. ECF No. 274-4, at 582. Joseph and Adriana Shayota did not seek to introduce any of this deposition testimony at their criminal trial. Similarly, Joseph and Adriana Shayota's attorney asked questions at the December 10, 2012 deposition of Leslie Roman. ECF No. 296-1.

Case No. 15-CR-00264-LHK
AMENDED ORDER DENYING MOTIONS FOR NEW TRIAL AND JUDGMENT OF ACQUITTAL

United States District Court
Northern District of California

Joseph and Adriana Shayota did not seek to introduce any of this deposition testimony at trial.

In short, Joseph and Adriana Shayota had ample opportunity to confront both Walid Jamil and Leslie Roman, and Joseph and Adriana Shayota in fact confronted Walid Jamil and Leslie Roman during their depositions. Thus, although Joseph and Adriana Shayota did not confront Walid Jamil and Leslie Roman face to face at the criminal trial, the introduction of the deposition testimony did not violate Joseph and Adriana Shayota's rights under the Confrontation Clause.

Similarly, although a jury's ability to see a witness's demeanor is important in many cases, the mere fact that the jury heard evidence in the form of out-of-court statements by unavailable witnesses does not violate the Confrontation Clause. Indeed, the Federal Rules of Evidence contain many examples of testimony that may be admitted in a criminal trial when a witness is unavailable to testify in person. *See generally* Federal Rule of Evidence 804 ("Hearsay Exceptions; Declarant Unavailable"). The Court already carefully considered the admissibility of Walid Jamil's and Leslie Roman's deposition testimony in its October 19, 2016 order. Joseph and Adriana Shayota's invocation of the general purpose of the Confrontation Clause in favoring live testimony does not undermine the Court's earlier analysis.

### b. Right to Confront Witnesses with Unconflicted Counsel

Joseph and Adriana Shayota also argue that Walid Jamil and Leslie Roman's deposition testimony should not have been introduced against Joseph and Adriana Shayota because Joseph and Adriana Shayota did not have the assistance of unconflicted counsel at the time of the civil depositions.[8] However, the Court already gave Joseph and Adriana Shayota several opportunities to address this issue in detail, and Joseph and Adriana Shayota declined to do so.

---

[8] In Adriana Shayota's motion for a new trial, Adriana Shayota joins with Joseph Shayota's argument that the introduction of Walid Jamil's deposition testimony violated the Confrontation Clause and Federal Rule of Evidence 802. ECF No. 500, at 2. Adriana Shayota's motion also appears to suggest that Adriana Shayota's Confrontation Clause rights were violated by the introduction of Adriana Shayota's own deposition against her. *See id.* ("At Ms. Shayota's own deposition, portions of which were read to the jury at trial, she was represented by SCMV counsel hamstrung by conflicts. Because Ms. Shayota's counsel also represented Joseph Shayota in the civil litigation, he could not elicit information from her that would have exculpated her but placed Mr. Shayota in a bad light."). However, there is no Confrontation Clause or hearsay problem with introducing Adriana Shayota's own statements against her. Fed. R. Evid. 801(d)(2).

When Joseph and Adriana Shayota first moved to exclude the deposition testimony of Walid Jamil and Leslie Roman before trial, their motion did not mention any conflict of interest between Joseph and Adriana Shayota at the time of the civil depositions of Walid Jamil and Leslie Roman. ECF No. 270. The Court ordered supplemental briefing on the Confrontation Clause issues on October 5, 2016, ECF No. 287, and in their responsive briefing Joseph and Adriana Shayota stated in passing that at the civil depositions, "[t]here was no conflict waiver as would occur in a criminal case . . . and conflict free representation should not be presumed," ECF No. 296, at 2. Therefore, at the hearing on the motion to exclude, the Court ordered Joseph and Adriana Shayota to "provide supplemental briefing identifying conflicts of interest that Defendants had during the prior civil proceedings and how such conflicts would affect the admissibility of the deposition statements in the instant criminal case." ECF No. 331, at 6; *see also* ECF No. 300. In response, Joseph and Adriana Shayota filed a short brief that identified only one source of an alleged conflict of interest: the fact that "[t]hroughout the civil litigation," Joseph Shayota allegedly privately encouraged Joseph and Adriana Shayota's attorney, David Greeley, not to delve too deeply into Joseph Shayota's alleged affair with Tyneisha Evans. ECF No. 307, at 2.

The Court addressed Joseph and Adriana Shayota's argument regarding conflicts of counsel in an order issued on October 19, 2016. ECF No. 331, at 18–25. The Court conducted an extensive review of relevant caselaw and found that conflicted counsel could implicate the defendants' rights under the Confrontation Clause if the conflict rendered counsel "unable to engage in 'meaningful confrontation.'" *Id.* at 19 (citing *United States v. Waters*, 2014 WL 65888 (D. Minn. Jan. 8, 2014)). The Court first noted that Joseph and Adriana Shayota's arguments were directed entirely at an alleged violation of Adriana Shayota's rights under the Confrontation Clause because Joseph Shayota never alleged that Joseph and Adriana Shayota's attorney at the civil deposition failed to adequately represent Joseph Shayota. *Id.* at 22. However, the Court also held that Joseph and Adriana Shayota had not provided sufficient evidence of the alleged conflict. Rather, Joseph and Adriana Shayota's argument about the conflict was supported only by a

declaration from McMullen, Adriana Shayota's attorney in the criminal case, who was not involved in the civil proceedings. *Id.* at 23. Furthermore, the Court noted that "[t]he Shayota defendants d[id] not provide evidence that Greeley actually followed Joseph Shayota's instructions, in which depositions Greeley limited his cross-examination, or to what extent the cross-examination was limited." *Id.* at 23–24. Indeed, even if Greeley did follow Joseph Shayota's instructions and did not delve too deeply into the affair with Tyneisha Evans, Adriana Shayota was unlikely to be prejudiced because evidence about Joseph Shayota's affair with and cash payments to Tyneisha Evans were discussed in detail in the civil depositions and during the criminal trial through deposition and live testimony as well as exhibits. *See, e.g.*, Deposition of Kevin Attiq, 11/5/12 at 410 (discussing cash payments to Tyneisha Evans); T.11/14/16 at 180 (testimony of Justin Shayota confirming that Joseph Shayota had an affair with Tyneisha Evans).

The Court therefore denied the motion to exclude on the basis of conflicts of counsel with leave to amend and ordered Joseph and Adriana Shayota to file any "reliable evidence that a conflict actually existed." *Id.* at 24. Joseph and Adriana Shayota failed to file anything in response. Indeed, Joseph Shayota never even suggested that his counsel during the civil trial was conflicted in a way that harmed Joseph Shayota's interests. However, despite these failures, Joseph and Adriana Shayota now raise the issue of conflicted counsel after a jury verdict against them.

Joseph and Adriana Shayota appear to concede that the Court's earlier decision about conflicted counsel was correct. Specifically, Joseph and Adriana Shayota admit that the conflict of interest between Joseph and Adriana Shayota "may not have been apparent prior to trial at the time when this Court made its ruling admitting the deposition testimony." ECF No. 501, at 10. However, Joseph and Adriana Shayota argue that the Court should reconsider its prior ruling because "trial proceedings made it abundantly clear that Adriana and Joe Shayota had vastly divergent strategies and interests." ECF No. 501, at 10.

However, the relevant question is not whether Joseph and Adriana Shayota had conflicting interests at the time of trial. Instead, as discussed in the Court's October 19, 2016 order, the relevant question is whether Joseph and Adriana Shayota had a conflict of interest at the time of

33

the civil depositions. Thus, the Court considers whether Joseph and Adriana Shayota had a conflict at the time of the civil depositions such that introduction of the depositions at Joseph and Adriana Shayota's criminal trial violated the Confrontation Clause or Federal Rule of Evidence 804(b)(1).

In order to admit out-of-court statements, the Confrontation Clause requires only legal representation sufficient to afford an opportunity for "meaningful confrontation." ECF No. 331, at 19. The Court has already held that both Joseph and Adriana Shayota had an opportunity to meaningfully confront Walid Jamil and Leslie Roman at Walid Jamil and Leslie Roman's civil depositions. Joseph and Adriana Shayota provide no new evidence of a conflict of interest at the time of the civil depositions. Additionally, Joseph and Adriana Shayota provide no authority or explanation of how subsequent divergence of interests at trial could undermine their prior opportunity for confrontation. Therefore, the Court reaffirms its prior holding that introducing Walid Jamil and Leslie Roman's deposition testimony against Joseph and Adriana Shayota did not violate the Confrontation Clause because both Joseph and Adriana Shayota had an opportunity for "meaningful confrontation" while represented by adequate counsel. *Id.*

Additionally, Joseph and Adriana Shayota argue that their "divergent strategies also relate[] to the motive requirement under Rule 804(b)(1)." Under Federal Rule of Evidence 804(b)(1), hearsay is admissible if (1) the declarant is unavailable at trial; (2) the statements were "given as a witness at a trial, hearing, or lawful deposition, whether given during the current proceeding or a different one"; and (3) the testimony is "offered against a party who had . . . an opportunity and similar motive to develop it by direct, cross-, or redirect examination." Fed. R. Civ. P. 804(b)(1).

Joseph and Adriana Shayota do not explain their argument under Rule 804(b)(1) other than the above single sentence stating that their different trial strategies "relate" to the motive requirement. However, the argument seems to be that because "trial proceedings made it abundantly clear that Adriana and Joe Shayota had vastly divergent strategies and interests," the trial proceedings made it clear that Joseph and Adriana Shayota in fact did not have similar

motives in the civil and criminal proceedings. ECF No. 501, at 10. Essentially, Joseph and Adriana Shayota argue that the Court should look to the specific context of the criminal trial as it progressed to determine whether the motives were the same for the purposes of Rule 804(b)(1).

Joseph and Adriana Shayota's argument is contrary to Ninth Circuit precedent. As discussed more fully in the Court's October 19, 2016 order, in evaluating motive under Rule 804(b)(1), the Ninth Circuit does not take a "fine-grained" approach by looking to "whether a party "t[ook] the same side on the same issue" and whether the party "had the same degree of interest to prevail at each proceeding." *United States v. Duenas*, 691 F.3d 1070, 1089 (9th Cir. 2012). Instead the Ninth Circuit looks to whether the "fundamental objective" of the party against whom the evidence is being offered is the same at both proceedings. *Id.*

In the Court's October 19, 2016 order, the Court found that Joseph and Adriana Shayota had the same "fundamental objective" to develop the testimony of deponents in the civil deposition as Joseph and Adriana Shayota had in the criminal trial. ECF No. 331, at 27. Specifically, in both the civil case and the criminal case, Joseph and Adriana Shayota had the fundamental objective of demonstrating that they were innocent of relabeling and counterfeiting 5-Hour ENERGY, and of blaming others for engaging in crime and deceiving Joseph and Adriana Shayota. In the civil case, Joseph and Adriana Shayota faced potential liability for millions of dollars in damages and faced increased penalties for having willfully infringed 5-Hour ENERGY trademarks. *See* Order on Summary Judgment, E.D.N.Y. Case No. 1:12-CV- 05354-KAM-ST, ECF No. 886 at 50–51 ("Civil Summary Judgment") ("Statutory damages for the non-willful infringement of registered trademarks are available from $1,000 to $200,000 per counterfeit mark per type of good," but "[i]f willful infringement [of the Lanham Act] is established, the maximum statutory damage award against each defendant is $10 million ($2 million maximum statutory award times five infringed 5-Hour ENERGY Marks)."). Additionally, Walid Jamil filed a cross-claim against Joseph and Adriana Shayota for fraudulent misrepresentation and other causes of action. *Id.* at 28.

Joseph and Adriana Shayota offer no reason to believe that the changes in their positions at

trial were so dramatic that their "fundamental objective" changed. Indeed, throughout the trial, Joseph and Adriana Shayota largely litigated the case together, which indicates that they appeared to believe that their interests were largely aligned. For example, Joseph and Adriana Shayota filed joint motions, ECF No. 220, 270, 306, 307, 323, a joint administrative motion, ECF No. 353, joint responses to motions, ECF No. 346, 265, joint objections, ECF No. 359, a joint witness list, ECF No. 253, joint exhibit lists, ECF Nos. 263, 354, 369, joint proposed jury instructions, ECF No. 260, a joint proposed verdict form, ECF No. 256, and joint proposed voir dire, ECF No. 254; *see generally* ECF Nos. 384 & 386. Indeed, both Joseph and Adriana Shayota have joined the same argument regarding conflicted counsel in the instant motion. ECF No. 501, at 7–16; ECF No. 500, at 2 ("On this issue, Ms. Shayota respectfully adopts the argument presented in Part II of co-defendant Joseph Shayota's motion for new trial.").

In short, Joseph and Adriana Shayota's arguments ask the Court to apply a test that the Ninth Circuit has specifically disavowed. Even if Joseph and Adriana Shayota's interests diverged somewhat at trial, this does not change the fact that in both the civil and criminal proceedings, both Joseph and Adriana Shayota had a similar motive to deny their knowledge of the conspiracies and to rebut Walid Jamil's efforts to shift responsibility. The Court therefore reaffirms its previous holding that the introduction of the deposition testimony against Joseph and Adriana Shayota did not violate Rule 804(b)(1).

### c. Right to Impeach and Cross-Examine

Joseph and Adriana Shayota also argue that the Confrontation Clause was violated because they were "denied their right to impeach the accusers' testimony." ECF No. 501, at 11. However, as discussed above, "the Confrontation Clause guarantees only 'an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish.'" *Owens*, 484 U.S. at 559 (emphasis in original). Joseph and Adriana Shayota had such an opportunity at the time of the depositions. The fact that Joseph and Adriana Shayota did not take full advantage of that opportunity does not mean that the Confrontation Clause has been violated.

Joseph and Adriana Shayota first argue that their Confrontation Clause rights were violated because they were unable to impeach Walid Jamil based on the fact that Walid Jamil was investigated for tax fraud. However, Joseph and Adriana Shayota did have the opportunity to impeach Walid Jamil based on the fact that Walid Jamil was investigated for tax fraud. In the Court's October 19, 2016 order regarding the tax fraud evidence and in the October 12, 2016 final pretrial conference, the Court granted Joseph and Adriana Shayota permission to read the following stipulation to the jury: "Walid Jamil was investigated for tax fraud by the Internal Revenue Service ("IRS") in Michigan. The Michigan IRS agents requested and received documents about this criminal case from the law enforcement agents investigating this criminal case. Walid Jamil was not indicted for tax fraud." ECF No. 329, at 11–12. Joseph and Adriana Shayota never read this stipulation to the jury. Thus, Joseph and Adriana Shayota had an opportunity to impeach Walid Jamil by referring to the tax fraud investigation, but Joseph and Adriana Shayota declined to do so.

The Court also already considered and rejected Joseph and Adriana Shayota's argument that they should be able to introduce extrinsic evidence of the tax fraud investigation based on both Rule 404(b) and Rule 608(b). In the Court's October 19, 2016 order, the Court first considered Joseph and Adriana Shayota's argument that Walid Jamil's investigation for tax fraud was admissible under Rule 404(b) to show some trait other than Walid Jamil's character for untruthfulness such as Walid Jamil's "modus operandi in such transactions." ECF No. 501, at 12; *see* ECF No. 329, at 6 ("The Court first considers whether Defendant's tax fraud evidence is material to another purpose other than Walid . . . Jamil's character to defraud."). However, the Court rejected this argument because "[t]ax fraud and fraudulently relabeling and counterfeiting energy drinks are not related in a way that might be material to proving knowledge, intent, preparation, planning, or modus operandi." ECF No. 329, at 7. Thus, the Court found that evidence of the tax fraud investigation was not admissible under Rule 404(b) to prove some trait other than Walid Jamil's character for untruthfulness.

The Court then considered whether extrinsic evidence of the tax fraud investigation could

be introduced to show Walid Jamil's character for untruthfulness. The Court specifically noted that Walid Jamil was only investigated for tax fraud and was never indicted, and thus the Court found that Joseph and Adriana Shayota had provided no proof that Walid Jamil actually committed tax fraud. *Id.* The Court therefore found that extrinsic evidence of the tax fraud investigation was inadmissible under Rule 608(b) to prove Walid Jamil's character for untruthfulness.[9] *Id.* at 8. Joseph and Adriana Shayota have not raised any new arguments to justify a finding that the Court's decision not to allow extrinsic evidence of the tax fraud investigation violated Joseph and Adriana Shayota's Confrontation Clause rights. Therefore, the Court reaffirms its October 19, 2016 decision to disallow the introduction of extrinsic evidence of the tax fraud investigation of Walid Jamil.

Joseph and Adriana Shayota also argue that their Confrontation Clause rights were violated because they had no opportunity to impeach Walid Jamil with evidence of his plea agreement. However, at the time of Walid Jamil's deposition testimony, Walid Jamil had not pled guilty – indeed, no criminal charges had yet been filed. Thus, evidence of Walid Jamil's plea agreement would not have impeached deposition testimony that Walid Jamil gave three or more years before the plea agreement. ECF No. 297 (October 7, 2016 plea agreement). Additionally, during the criminal trial Joseph and Adriana Shayota never made any attempt to introduce Walid Jamil's plea agreement into evidence or to have the Court instruct the jury that Walid Jamil pled guilty to the charged crimes.

For these reasons, the Court finds that Joseph and Adriana Shayota's arguments regarding the plea agreement and the tax fraud evidence do not justify granting a new trial.

### 9. Juror Misconduct

Both Joseph and Adriana Shayota argue that they were denied their Sixth Amendment

---

[9] In a footnote, Joseph and Adriana Shayota state that the Court cited cases from before the 2003 amendment to Rule 608(b). However, the 2003 amendment was meant only to "clarify" the scope of Rule 608 and did not change the actual scope of the Rule. Committee Notes on Rules – 2003 Amendment, Federal Rule of Evidence 608. Thus, the 2003 amendment did not cast doubt on the precedents that the Court cited.

Case No. 15-CR-00264-LHK
AMENDED ORDER DENYING MOTIONS FOR NEW TRIAL AND JUDGMENT OF ACQUITTAL

right to a fair and impartial jury because of juror misconduct. Specifically, jury foreperson Rachel Cretcher filed a declaration claiming that juror Steven Taylor stated during deliberations that Baja Exporting had been required to pay $20,000,000 to Living Essentials as a result of the civil lawsuit regarding 5-Hour ENERGY. ECF No. 501-1, at 21. Joseph and Adriana Shayota note that no evidence was presented during trial indicating that Baja Exporting had been ordered to pay $20,000,000. ECF No. 501, at 7. Indeed, this $20,000,000 amount is incorrect. Although at least one publicly available article reported that Living Essentials was awarded $20,000,000 in the entire lawsuit, ECF No. 501-1, at 17–18, Baja Exporting was required to pay only $6,000,000 pursuant to a settlement agreement with Living Essentials, ECF No. 501-1, at 4. Thus, Joseph and Adriana Shayota argue that Steven Taylor tainted the jury's deliberations by conducting outside research and introducing extraneous information in violation of the Court's express prohibition.

However, Steven Taylor filed a declaration stating that he did not conduct outside research and that he never said that Baja Exporting was required to pay $20,000,000. ECF No. 527-1. Specifically, Taylor made the following claims in his declaration. Taylor stated that Rachel Cretcher called him and asked him if he remembered mentioning a $20,000,000 settlement. *Id.* at 2. Taylor denied mentioning a $20,000,000 settlement, but stated instead that he referred only to the existence of a civil lawsuit, which had been mentioned during the criminal trial. *Id.* at 3. Taylor claims that Cretcher then admitted that her own recollection of the deliberations was vague and that Cretcher stated that "other jurors" also did not remember Taylor's alleged statement. *Id.* However, Cretcher suggested that if Taylor could remember mentioning the $20,000,000 settlement, there would be a new trial, Adriana Shayota would be "out of trouble," and the Court "wouldn't do anything" to Taylor. *Id.* Taylor also stated in his declaration that he did not violate the Court's order to refrain from conducting any outside research about the case. *Id.*

The Ninth Circuit has held that a court should grant a new trial based on juror misconduct if "the misconduct prejudiced the defendant to the extent he did not receive a fair trial." *United States v. Berry*, 627 F.2d 193, 197 (9th Cir. 1980). In determining whether the misconduct resulted in prejudice, a court should consider "the totality of the circumstances." *Id.* at § 587. Specifically,

39

the Ninth Circuit has held that a district court should consider "a number of factors," including, if applicable,

> (1) whether the material was actually received, and, if so, how; (2) the length of time it was available to the jury; (3) the extent to which the jurors discussed and considered it; (4) whether the material was introduced before a verdict was reached, and if so at what point in the deliberations; and (5) any other matters which may bear on the issue of the reasonable possibility of whether the material affected the verdict. *United States v. Saya*, 247 F.3d 929, 937 (9th Cir. 2001), *amended*, 2001 WL 476942 (9th Cir. May 8, 2001).

The Ninth Circuit has held that the standard for granting a new trial based on juror misconduct is whether "there existed a reasonable possibility that the extrinsic material could have affected the verdict." *United States v. Mills*, 280 F.3d 915, 921 (9th Cir. 2002). This "reasonable possibility" test is "equivalent to the harmless error rule applicable to constitutional errors." *United States v. Bagley*, 641 F.2d 1235, 1241 (9th Cir. 1981).

Joseph Shayota, Adriana Shayota, and the Government agreed that the Court should hold an evidentiary hearing to determine whether any juror misconduct occurred and whether that alleged misconduct was sufficiently serious to warrant a new trial. Therefore, on April 18, 2017, the Court held a hearing on the issue of juror misconduct.

At the hearing, Adriana Shayota first called Rachel Cretcher, the jury foreperson, to the stand. Cretcher gave the following testimony at the hearing. Cretcher testified that on November 28, 2016, after the jury announced the verdict at 3:40 p.m. and was subsequently excused, Cretcher located the profile of McMullen, Adriana Shayota's attorney, on the social networking site LinkedIn. April 18, 2017 Hearing Transcript at 8. That same day, November 28, 2016, Cretcher contacted McMullen seeking a "personal relationship." *Id*. Cretcher and McMullen exchanged telephone numbers and began to text each other. *Id.* at 8–9, 18. Cretcher and McMullen arranged to meet in Las Vegas for a trip that same weekend, December 2, 3, and 4, 2016. *Id.* at 17, 45. However, on November 30 or December 1, 2016, McMullen texted Cretcher and informed her

United States District Court
Northern District of California

that another juror had information that might form the basis of a motion for a new trial. *Id.* at 9. Therefore, McMullen stated that he and Cretcher should have no further personal contact. *Id.* Cretcher testified that after that time, she and McMullen had no further personal contact. *Id.*

Cretcher testified that about a week after the verdict, she spoke to Virginia McDonnal, the juror who had given McMullen the information that might form the basis of a motion for a new trial. *Id.* at 10. Cretcher called McMullen on December 7, 2016. *Id.* at 10, 46. During the conversation, McMullen mentioned certain conduct that could be grounds for a new trial. *Id.* at 10–11. Specifically, Cretcher recalled that McMullen mentioned that the Court might order a new trial if a juror "did not share information" during voir dire or if any juror introduced material not in evidence into the deliberations. *Id.* at 19. After McMullen mentioned this possible ground for a new trial, Cretcher informed McMullen that Taylor had mentioned a $20,000,000 settlement in the civil case. *Id.* at 11, 19. Cretcher admitted that this is the first time she had told anyone about Taylor's alleged statement. *Id.* at 19. Cretcher never mentioned the statement to other jurors, the Court, or anyone else. *Id.* at 16–17. After Cretcher informed McMullen of her claim, McMullen drafted a declaration on behalf of Cretcher, which Cretcher signed on December 8, 2016. *Id.* at 20.

Cretcher further testified that on January 6, 2017, Cretcher then made a phone call to Steven Taylor. *Id.* at 21. According to Cretcher, no one had asked her to make this phone call and she had not told anyone of her plans to make the phone call. *Id.* Cretcher testified that during the phone call, she told Taylor that she felt "troubled" about the guilty verdict rendered against Adriana Shayota. *Id.* at 43. Cretcher testified that she then told Taylor about her "vague memory" that Taylor had made a statement about a $20,000,000 settlement and asked Taylor if he had made such a statement. *Id. at* 21–22. According to Cretcher, Taylor denied making the statement. *Id.* at 13.

Cretcher was later interviewed about these events by the FBI. At the FBI interview, Cretcher admitted that she was not certain that Taylor had made the alleged statements. Specifically, Cretcher stated that her certainty was "a 7.5 out of ten," which Cretcher revised later in the FBI interview to an "8 out of 10." *Id.* at 22. At the time of the hearing, Cretcher stated that

41

she was not "100% sure" that the Taylor made the alleged statement, but she was "very confident" that he did. *Id.* At the hearing, Cretcher testified that she followed all of the Court's instructions at trial. *Id.* at 27.

The Government then called Steven Taylor to the stand. Taylor testified that on January 6, 2017, Cretcher called Taylor and asked him to speak in person about something that she did not want to discuss over the phone. *Id.* at 30. After the phone call, Taylor decided that meeting in person "seemed odd," and therefore Taylor told Cretcher that she should tell him what she had to say over the phone. *Id.* According to Taylor, Cretcher then stated that she felt "guilty" about the verdict against Adriana Shayota. *Id.* Cretcher then mentioned a vague memory that Taylor had mentioned a $20,000,000 settlement. *Id.* at 31. Taylor denied making the statement, and Cretcher then stated that if Taylor were to remember this statement, Adriana Shayota would "get out of trouble" and Taylor "wouldn't be in trouble." *Id.* at 33. Taylor stated that the conversation ended "awkwardly" because Cretcher seemed to hope that Taylor would state that he had mentioned a $20,000,000 settlement, but Taylor would not agree to state that he had done so. *Id.*

Taylor states that after thinking about the conversation, he decided to email Assistant U.S. Attorney Matthew Parrella and inform him about the conversation. *Id.* at 34–35. Taylor sent this email on January 9, 2017. *Id.* at 36. Taylor states that other than this email and the drafting of the declaration, Taylor had only logisitical discussions with the Government prior to the evidentiary hearing. *Id.* at 41.

Taylor testified that he never conducted outside research before the trial was completed. Taylor stated that he was "absolutely sure" that he had never mentioned a $20,000,000 settlement at trial. *Id.* at 30. When asked whether an analysis of his computer would confirm that Taylor had not searched for terms related to the trial before the verdict was rendered, Taylor confirmed without hesitation that a computer analysis would confirm his testimony. *Id.* at 38. Taylor testified that he followed all of the Court's instructions at trial. *Id.* at 42.

The Court finds that Taylor's testimony was more credible than Cretcher's testimony. Cretcher herself admitted that she did not clearly remember whether Taylor made the alleged

statement. Indeed, Cretcher's statements to Taylor suggest that she wanted Taylor to confirm her story regardless of whether it was true. At the time of the FBI interview, Cretcher stated that on a scale of one to ten, her certainty about Taylor making the alleged statement was about a 7.5 or 8. At the time of the evidentiary hearing, Cretcher stated that she was not 100% certain that Taylor had made the alleged statement. Cretcher did not mention the statement at the time it was allegedly made or at any time until December 7, 2016, after McMullen informed her that extraneous information might be grounds for a new trial. No other jurors remembered Taylor making the alleged statement. Cretcher's demeanor and manner of testifying at the evidentiary hearing suggested uncertainty. Cretcher frequently qualified her answers and avoided answering directly and clearly.

In contrast, Taylor stated repeatedly and forcefully that he was certain that he had never made the alleged statement. Taylor stated that he was 100% sure he did not make the statement and was confident that a computer analysis would vindicate him. Taylor's demeanor also suggested much more confidence than Cretcher's demeanor. These factors alone are more than enough to justify the Court's decision to credit Taylor's testimony rather than Cretcher's.

Furthermore, Cretcher's testimony is less credible than Taylor's testimony for another reason as well. Specifically, the circumstances of Cretcher's relationship with McMullen suggest that after the trial, she was biased in favor of Adriana Shayota and had an interest in finding information that would justify a new trial. Cretcher testified that the day of the verdict, she, the foreperson of the jury that had found McMullen's client guilty, contacted McMullen to establish a personal relationship and that the two arranged to take a trip to Las Vegas that weekend. However, before the trip, McMullen had to cut off personal contact with Cretcher because of the possibility of a new trial. The next week, Cretcher contacted McMullen and asked about possible grounds for a new trial. After McMullen informed her that extraneous information might justify a new trial, Cretcher mentioned for the first time to anyone that Taylor had made the alleged statement. These circumstances suggest that Cretcher may have been willing to stretch her vague recollection to assist in obtaining a new trial.

43

Cretcher's testimony and demeanor also suggested that Cretcher was not primarily concerned with whether Taylor made the alleged statements, but instead Cretcher was instead primarily concerned with finding a way that Adriana Shayota could be granted a new trial.

In short, Cretcher was uncertain of her allegation, her testimony was not credible, and she had a strong interest in helping McMullen and Adriana Shayota. In contrast, Taylor testified consistently and forcefully that he did not conduct outside research or introduce extraneous information at trial, and his demeanor and manner of testifying indicated confidence and credibility. Moreover, no juror other than Cretcher recalls Taylor making the alleged statement. For these reasons, the Court credits Taylor's testimony and does not credit Cretcher's testimony.

Therefore, based on the record in this case, the Court finds that Taylor did not violate the Court's instructions not to research the case or read or view any media related to the case. The Court also finds that during the jury deliberations, Taylor did not mention that there was a $20,000,000 settlement in the civil case. In short, the Court finds that no juror misconduct occurred. Therefore, the Court determines that no member of the jury "actually received" extraneous information, and therefore a new trial is not justified. *Saya*, 247 F.3d at 937.

Even if Taylor had mentioned a $20,000,000 settlement, however, there is no indication that such a statement would have influenced the jury. No other jurors heard the alleged statement. Cretcher never told anyone about the statement before Cretcher told McMullen on December 7, 2016, more than a week after the verdict. Moreover, Cretcher testified that despite her belief that Taylor had made the alleged statements, Cretcher nevertheless followed all of the Court's instructions at trial. Among these instructions was an instruction that jurors "are to decide the case solely on the evidence received at the trial" and instruction that the jury "must decide the case solely on the evidence and the law." ECF No. 454, at 2, 7. Thus, according to Cretcher, she was not influenced by the alleged introduction of any outside evidence and instead rendered her verdict based only on the evidence received at trial.

Additionally, testimony at trial had already informed the jury that there was a civil case against Baja Exporting and that the civil case ended in a settlement. Specifically, during the

testimony of Kevin Attiq, the following questioning took place:

> BY MS. KNIGHT
>
> Q. Was Dan Dee sued by Baja for the sales of 5-Hour Energy – for the
> purchase of 5-Hour Energy?
>
> A. I think they sue me, I sue them, and – Susan, I had multiple suit against
> my company. Never got sued in my life and now, whoops, everybody
> comes and sue me, everybody. I think they sue me and I sue them and, at
> the end, the attorneys agree about whatever. You can ask Mr. Vega about
> it. He knows. I forgot about it to be honest.
>
> . . .
>
> BY MR. VEGA
>
> Q. Mr. Attiq, we settled because we were both victims, weren't we, of
> Wally Jamil? Yes or no?
>
> A. I believe one thing is all of us, I believe, all of us, we are guilties. T.
> 11/15/16 at 88–89.

Vega's question and Kevin Attiq's answer clearly indicated that the civil lawsuit against Baja Exporting had ended in a settlement. Thus, even if Taylor had mentioned a $20,000,000 settlement, the only information that this would have added is the $20,000,000 amount. There is no reason to believe that the $20,000,000 amount alone would have influenced the jury's judgment. The charges against Joseph or Adriana Shayota did not depend on the amount of money involved in the criminal conspiracies. Additionally, even if the Court were to credit Cretcher's account, the extraneous information reached at most two jurors, Cretcher and Taylor, both of whom testified that they followed the Court's instructions, including the instruction not to consider extraneous information. Thus, the Court finds that even if Taylor made the alleged statement, the statement was "harmless beyond a reasonable doubt." *Dickson v. Sullivan*, 849 F.2d 403, 406 (9th Cir. 1988).

For these reasons, the Court DENIES Joseph and Adriana Shayota's motions for a new

trial on the grounds of juror misconduct.

### 10. Failure to Correct False Testimony under *Napue*

Both Joseph and Adriana Shayota move for a new trial on the grounds that the Government failed to correct false testimony in violation of Joseph and Adriana Shayotas' Fourteenth Amendment rights under *Napue v. Illinois*, 360 U.S. 264 (1959).

Under *Napue v. Illinois*, a defendant's conviction violates the Fourteenth Amendment if the Government obtains the conviction "through use of false evidence, known to be such by representatives of the State," or where the "State, although not soliciting false evidence, allows it to go uncorrected when it appears." 360 U.S. 264, 269 (1959). "A conviction obtained by the knowing use of perjured testimony is fundamentally unfair, and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *United States v. Agurs*, 427 U.S. 97, 103 (1976). A claim under *Napue* and its progeny will succeed when the Government fails to correct testimony and (1) the testimony or evidence was actually false, (2) the Government knew or should have known that the testimony or evidence was actually false, and (3) the false testimony or evidence was material. *Henry v. Ryan*, 720 F.3d 1073, 1084 (9th Cir. 2013). As in a *Brady* claim, the materiality standard for claims under *Napue* asks whether there is "any reasonable likelihood that the false testimony could have affected the judgment of the jury." *Jackson v. Brown*, 513 F.3d 1057, 1076 (9th Cir. 2008). The ultimate question is whether the defendant "received a trial resulting in a verdict worthy of confidence." *Id.*

Joseph and Adriana Shayota argue that the Government violated its duty under *Napue* to correct both Kevin Attiq's live testimony and Walid Jamil's deposition testimony. The Court addresses these arguments in turn.

### d. Kevin Attiq

First, Joseph and Adriana Shayota claim that Kevin Attiq offered false testimony and the Government failed to correct that testimony. Kevin Attiq pled guilty to Count 2 of the Superseding Information on November 4, 2016. ECF No. 408. As part of Kevin Attiq's plea agreement with

46

United States District Court
Northern District of California

the Government, Kevin Attiq agreed to plead guilty to Count 2 of the Superseding Information and agreed to cooperate with the Government by testifying truthfully at trial. ECF No. 408, ¶ 10. In exchange, the Government agreed to recommend a certain sentencing range and, if Kevin Attiq cooperated "fully and truthfully," to recommend a downward departure. *Id.* at ¶¶ 18, 20. Additionally, the Government agreed to recommend Fadi Attiq to the Northern District of California's Pretrial Diversion Program "for an evaluation of his eligibility to participate in a pretrial diversion program." *Id.* ¶ 21. If Fadi Attiq completed a period of supervision and the pre-trial services officer reported that Fadi Attiq complied with the conditions of pre-trial diversion, the Government would "move to dismiss the charges in the criminal information as to Fadi Attiq." *Id.*

During the trial, Kevin Attiq testified as a witness for the Government. During cross-examination by Adriana Shayota's attorney, Kevin Attiq testified as follows:

Q. And after this case began October 25th, you did decide to plead guilty?

A. Yes.

Q. And Mr. Parrella made an agreement with you that he would dismiss the case against your brother if he pled?

A. No, he didn't.

Q. You understand that the agreement that you have is that your brother's case will be dismissed?

A. No, I didn't.

Q. Okay. Do you understand at this point that your brother was offered what's called a deferred prosecution agreement?

A. I think he has another court date. I don't know what's going to happen to him.

Q. You understand that that deferred prosecution agreement means that he will not go to trial and his case will be dismissed after a period of time?

A. I don't know about that kind of law they said about this one here. You know much better than me.

Q. Okay. You -- let's talk about what you do understand. What do you understand

is going to happen to your brother now that you've pled guilty?

A. I think he has another court date with the judge. She's going to decide what she

have to do with my brother.

Q. And you understand that there will be a recommendation from the prosecutor

that he will not have a case anymore?

A. I don't have no idea.

Q. Okay. That influenced you to decide to plead guilty?

A. No. I just pled guilty because I sold relabeled counterfeited, and also I pled

guilty because I sold counterfeited product without – that's why I have Count

Two, I don't have no Count One, and Count One and Count Two, I didn't know

the product was counterfeit.

In short, Kevin Attiq testified that he knew that his brother had another court date but did not

know about any "deferred prosecution agreement," which is a phrase that was never used in

Kevin Attiq's plea agreement. ECF No. 408. Joseph and Adriana Shayota argue that in this

testimony Kevin "denied that any . . . agreement" about Fadi Attiq existed. ECF No. 501, at 17.

Joseph and Adriana Shayota also argue that the Government improperly failed to promptly

correct this testimony and to inform the jury that Kevin Attiq's plea agreement did in fact contain

a promise that the Government would refer Fadi Attiq to pre-trial diversion.

As discussed above, Joseph and Adriana Shayota's argument under *Napue* can succeed

only if (1) the testimony or evidence was actually false, (2) the prosecution knew or should have

known that the testimony or evidence was actually false, and (3) the false testimony or evidence

was material. *Henry*, 720 F.3d at 1084. The Court finds that evidence of the plea agreement

regarding Fadi Attiq was not material within the meaning of *Napue*. Therefore, the Court need

not consider whether the testimony was actually false or whether the Government knew it was

false.

In determining whether evidence is material, the critical question is whether in light of

United States District Court
Northern District of California

the allegedly false evidence Joseph and Adriana Shayota "received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Hayes*, 399 F.3d at 984 (quoting *Hall v. Director of Corrections*, 343 F.3d 976, 983-84 (9th Cir. 2003) (per curiam)). As discussed above, evidence is material if there is "any reasonable likelihood" that the information could have affected the judgment of the jury." *Jackson*, 513 F.3d at 1076.

In the instant case, there is no reasonable likelihood that if Kevin Attiq had described the full nature of the agreement regarding his brother Fadi Attiq, this information would have affected the judgment of the jury. First, the jury already had ample reason to discredit Kevin Attiq's testimony. Before the jury retired for deliberations, the Court specifically instructed the jury that Kevin Attiq was a Government witness who had pled guilty to the crimes involved in the trial and that the jury "should consider the extent to which or whether [Kevin Attiq's] testimony may have been influenced by any factors." T.11/22/16, at 12. For that reason, the Court instructed the jury that it should "examine the testimony of . . . Kevin Attiq with greater caution than that of other witnesses." *Id.* In short, the jury already knew that Kevin Attiq's credibility was questionable because he was a cooperating witness, and it is very unlikely that having the specific nature of the plea agreement confirmed would have further influenced the jury's judgment. *See United States v. Alli*, 344 F.3d 1002 (9th Cir. 2003) (finding that a defendant was unlikely to have been harmed by the introduction of false evidence in part because the Court instructed the jury to treat the testimony with "greater caution than that of ordinary witnesses").

Additionally, neither Joseph nor Adriana Shayota has made any attempt to explain how the jury's judgment might have been affected if the plea agreement regarding Fadi Attiq had been confirmed. Joseph Shayota argues that confirmation of the plea agreement would have constituted impeachment evidence, but neither he nor Adriana Shayota explain how damaging Kevin Attiq's credibility could have affected the jury's judgment. Indeed, in his closing argument on behalf of Adriana Shayota, McMullen asserted that Kevin Attiq's testimony in fact helped Joseph and Adriana Shayota. T.11/22/16, at 113–14. Specifically, McMullen stated that

49

the Government had tried to "backpedal" from Kevin Attiq's testimony because Kevin Attiq had "told the truth about everything. And the truth was that Wally [Jamil] deceived him and Joe [Shayota], that he had no idea that the product was counterfeit [and] that he thought it was diverted product . . . ." *Id.* This failure to argue materiality alone is fatal to Joseph and Adriana Shayota's claims under *Napue*. *See Hein v. Sullivan*, 601 F.3d 897, 908 (9th Cir. 2010) ("To prevail on a *Napue* claim, the petitioner must show . . . that the false testimony or evidence was material.") (internal quotation marks and alterations omitted). In light of Adriana Shayota's trial strategy to argue that Kevin Attiq had told the truth, the Court finds that further impeaching Kevin Attiq's testimony was very unlikely to have affected the jury's judgment in favor of Joseph and Adriana Shayota.

In short, Joseph and Adriana Shayota also have not established the materiality element of their *Napue* claim for another reason, which derives from the Ninth Circuit's decision in *James v. Ryan*, 679 F.3d 780 (9th Cir. 2012). In *James*, both the witness and the prosecutor falsely denied that the witness had entered a plea agreement. The Ninth Circuit held that neither "nondisclosure of nor the state's acquiescence in [the witness's] false testimony was material because [the witness's] testimony could have been corroborated by [an earlier] statement . . . which preceded any plea agreement." *Id.* at 805.[10] In other words, the plea agreement was not material because even if the plea agreement had been introduced as evidence of the witness's lack of credibility, the Government could have overcome this evidence with an earlier consistent statement.

The same is true in the instant case. On November 5, 2012 and October 11, 2013, Kevin Attiq gave deposition testimony under oath in the *Pittsburgh* Action, N.D. Cal. Case No. 3:12-CV-05523-WHA. In these depositions, which took place over three years before Kevin Attiq's

---

[10] The United States Supreme Court vacated and remanded the Ninth Circuit's decision in *James*, but on remand the Ninth Circuit emphasized that the Supreme Court's decision did not affect the Ninth Circuit's decision on the *Napue* issue and thus reaffirmed that aspect of its earlier holding. *James v. Ryan*, 733 F.3d 911, 916 (9th Cir. 2013).

plea agreement with the Government and over a year and a half before criminal charges were filed, Kevin Attiq repeated much of the same testimony that he gave during Joseph and Adriana Shayota's criminal trial. Kevin Attiq's deposition testimony corroborated nearly every important element of his testimony at trial.

For example, both Kevin Attiq's live testimony and deposition statements contained the following evidence:

- Evidence that Joseph Shayota initially sold Kevin Attiq English-labeled 5-Hour ENERGY that Kevin Attiq believed was diverted. T. 11/14/16 at 191–93; Deposition 11/5/12 at 184, 209.

- Evdience that Joseph Shayota recommended that Kevin Attiq purchase English-labeled 5-Hour ENERGY from Walid Jamil. T. 11/14/16 at 193–94; Deposition 10/11/13 at 353.

- Evidence that Kevin Attiq asked Joseph Shayota whether he thought that Walid Jamil would reduce the price of 5-Hour ENERGY to Kevin Attiq. T. 11/14/16 at 203–04; Deposition 10/11/13 at 376.

- Evidence that Kevin Attiq spoke to Walid Jamil about reducing the price and that Walid Jamil suggested that he, Kevin Attiq, and Joseph Shayota split the profit from the 5-Hour ENERGY three ways. T. 11/15/16 at 39–40; Deposition 10/11/13 at 376–77.

- Evidence that Kevin Attiq often paid Joseph Shayota in cash. T. 11/14/16 at 279–81; Deposition 11/5/12 at 135, 139, 143.

- Evidence that Kevin Attiq believed the payment to Joseph Shayota was for debts that Walid Jamil owed to Joseph Shayota. T. 11/15/16 at 39–40; Deposition 11/5/12 at 136.

- Evidence that Joseph Shayota introduced Kevin Attiq to several customers for 5-Hour ENERGY. T. 11/15/16 at 84–85; T. 11/14/16 at 261–63; Deposition 11/5/12 at 178.

- Evidence that Kevin Attiq sold 5-Hour ENERGY to Baja Exporting as a middleman to be sent to a customer. T. 11/14/16 at 259; Deposition 11/5/12 at 185.

- Evidence that Kevin Attiq prevented two suspicious strangers from purchasing 5-Hour ENERGY. T. 11/14/16 at 208–12; Deposition 10/11/13 at 285.

United States District Court
Northern District of California

- Evidence that after the attempted purchase Kevin Attiq attempted to return the 5-Hour ENERGY to Walid Jamil. T. 11/14/16 at 212; Deposition 11/5/12 at 294, 297.
- Evidence that Kevin Attiq occasionally paid money to Tyneisha Evans for candy. T. 11/15/16 at 25–32; Deposition 10/11/13 at 408.

Thus, as in *James*, even if the Government had confirmed the existence of an agreement involving Fadi Attiq and the defense had sought to undermine Kevin Attiq's credibility with this evidence, the Government could have introduced Kevin Attiq's deposition statements as prior consistent statements under Federal Rule of Evidence 801(d)(1). *See* Fed. R. Evid. 801(d)(1)(1)(B)(ii) (providing that a statement is not hearsay if it is consistent with the declarant's testimony and is introduced "to rehabilitate the declarant's credibility as a witness when attacked on another ground"). Thus, as in *James*, the existence of prior corroborating testimony supports the Court's conclusion that the allegedly false evidence in the instant case was not material.

In short, Joseph and Adriana Shayota have not established that the allegedly false evidence was material. Therefore, the Court need not consider where the evidence was actually false or the Government knew that it was false. For the foregoing reasons, the Court DENIES Joseph and Adriana Shayota's motion for a new trial based on the allegedly false testimony of Kevin Attiq.

### e. Walid Jamil

Second, Joseph and Adriana Shayota claim that Walid Jamil's deposition contained false testimony that the Government failed to correct. Joseph and Adriana Shayota argue that Walid Jamil falsely attempted to "lay all blame at Joe Shayota's feet." ECF No. 501, at 18. Specifically, Walid Jamil testified that he believed that the labeling operation was approved by 5-Hour ENERGY and repeatedly denied that he had knowingly labeled or distributed counterfeit product. November 27, 2012 Deposition of Walid Jamil, at 14–15, 20–21. Joseph and Adriana Shayota argue that under *Napue*, the Government should have informed the jury "that Walid lied repeatedly, and that his denials of responsibility were false." *Id.* at 23–24.

United States District Court
Northern District of California

Again, Joseph and Adriana Shayota's argument under *Napue* can succeed only if (1) the testimony or evidence was actually false, (2) the prosecution knew or should have known that the testimony or evidence was actually false, and (3) the false testimony or evidence was material. *Henry*, 720 F.3d at 1084. Joseph and Adriana Shayota are correct that Walid Jamil's statements that Living Essentials had approved the relabeling were false. However, the Government sufficiently corrected the false testimony and therefore there is no reasonable likelihood that the false information would have affected the judgment of the jury.

Even before Walid Jamil's deposition testimony was read at trial, the Government took steps to inform the jury of the falsity of Walid Jamil's testimony that the labeling operation was approved by Living Essentials. For example, on the first day of evidence, the second witness in the trial, Robert McCormack, the head of international sales for Living Essentials who had dealt with Baja Exporting in its purchase of Spanish label 5-Hour ENERGY and its attempted sale of the product in Mexico, testified. Although Walid Jamil claimed that McCormack had given him permission to relabel the bottles, November 27, 2012 Deposition of Walid Jamil, at 20–21, the Government elicited the following testimony from McCormack:

Q. So at any point during the relationship between 5-Hour Energy and Baja Exporting, did you give Baja Exporting permission to place English labels on the Spanish labeled bottles to replace the labels?

A. No, Ma'am.

Q. Did you give them permission to sell the Spanish labeled 5-Hour Energy in the United States?

A. No, Ma'am.

Q. Did you give them permission to make boxes with – boxes in English for 5-Hour Energy, the display cases?

A. No, Ma'am.

Q. Did you give permission for them to manufacture the product, such as making the liquid?

A. No, Ma'am. T.10/25/16 at 100.

The Government then referred to this testimony again in its closing argument. The Government stated that Walid Jamil's testimony that Living Essentials had approved the relabeling was "just not true. Not true. In fact, it's not even – Joe Shayota doesn't even mention that in his own deposition. It is not true because Rob McCormack told you there was no permission given for them to relabel this product." T.11/22/16 at 39. The Government also stated more generally, "One thing about Wally Jamil, we know he's a bad guy. We know we can't trust him." *Id.*

After the reading of Walid Jamil and Leslie Roman's deposition testimony, the Government called Justin Shayota to the stand, who testified extensively that Walid Jamil was untrustworthy. For example, Justin Shayota confirmed that he had previously stated that he "do[esn't] believe a word [Walid Jamil] says," and testified that at trial Justin Shayota still felt that way "hundred percent." T.11/14/16, at 178. Justin Shayota also confirmed that he had said that Walid Jamil "doesn't care who he takes and, you know, I should – I should have been smarter about dealing because I've seen him screw over a lot of people when it comes to money." *Id.* at 168.

Joseph and Adriana Shayota argue that this was insufficient to correct Walid Jamil's testimony. Joseph and Adriana Shayota argue that "immediately upon submission of Walid's deposition, the government should have informed the jury that Walid lied repeatedly, and that his denials of responsibility were false." ECF No. 501, at 18. However, as discussed above, on the first day of evidence the Government introduced evidence indicating that Walid Jamil's denials of responsibility were false. Additionally, relevant precedent suggests that there is substantial flexibility in how best to inform the jury of the falsity of certain evidence. *United States v. LaPage*, 231 F.3d 488, 492 (9th Cir. 2000) (noting that a prosecutor can "work out in a bench conference with the judge and defense counsel how to inform the jury immediately that the testimony is false").

Even if the Government's method of informing the jury about the falsity of Walid Jamil's testimony was not ideal, it was sufficient to ensure that there is no "reasonable likelihood" that

54

the inaccuracies in Walid Jamil's testimony would have affected the jury's judgment. *Jackson*, 513 F.3d at 1076. Considering the Government's theory of the case, the testimony of other witnesses, and the full context of the proceedings, it is simply implausible that any juror was left with the impression that the Government believed that Walid Jamil's denials of responsibility were true.

In short, even if the Government had followed Joseph and Adriana Shayota's preferred method of informing the jury that Walid Jamil's testimony was false, there is no "reasonable likelihood" that the jury's judgment would have been affected. *Id.* Overall, therefore, the false statements in Walid Jamil's testimony do not "undermine[] confidence in the outcome of the trial." *Hayes*, 399 F.3d at 984. Thus, the Court DENIES Joseph and Adriana Shayota's motion for a new trial on the grounds that the Government improperly failed to correct Walid Jamil's false testimony.

### 11. Weight of the Evidence and Interests of Justice

Finally, Adriana Shayota argues that a new trial is justified because the verdict was against the weight of the evidence and because even if any single error was minor, together all the errors in the trial make a new trial warranted in the interests of justice. Under Rule 33, "[a] district court's power to grant a motion for new trial is much broader than its power to grant a motion for judgment of acquittal. The district court need not view the evidence in the light most favorable to the verdict; it may weigh the evidence and in so doing evaluate for itself the credibility of the witnesses." *United States v. Alston*, 974 F.2d 1206, 1211 (9th Cir.1992). The question remains whether the interests of justice would be served by granting a new trial. Having reviewed the evidence and the parties' briefing, the Court finds that the evidence was more than sufficient to justify a guilty verdict against Adriana Shayota. In particular, six pieces of evidence strongly support the verdict.

First, the Government produced evidence that Adriana Shayota emailed from herself to herself an Excel spreadsheet that contained many entries related to the conspiracies. ECF No. 500-1 at 177. Specifically, the spreadsheet contained the heading "5HR," which Adriana Shayota

concedes in her motion "mean[t] 5-Hour Energy." ECF No. 499, at 4. The spreadsheet listed several wire transfers that Adriana Shayota made from Baja Exporting to Midwest and JT Wholesale for "payroll," "equipment," and "boxes cost." *Id.* Adriana Shayota testified in her deposition testimony that she simply followed Walid Jamil's instructions in creating this spreadsheet. However, the Court finds it unlikely that Adriana Shayota, who controlled the accounting of Baja Exporting, simply blindly filled in a spreadsheet and paid over $500,000 without knowing the nature of the payments. Additionally, even if Adriana Shayota's statements about the spreadsheet were true, this would undermine Adriana Shayota's claim that Walid Jamil "conned" Joseph and Adriana Shayota. Specifically, if Walid Jamil concealed the relabeling and counterfeiting conspiracies from Joseph and Adriana Shayota, it is unlikely that Walid Jamil would have dictated the detailed expenses of the conspiracies for Adriana Shayota to enter on a spreadsheet.

Second, Justin Shayota emailed an invoice to Adriana Shayota at the request of Walid Jamil for 503 "cases" as well as "[t]rucking labels supplies ink for rest of orders." Transcript 11/14/16 at 53–54. Although Adriana Shayota testified in her deposition that she told Justin Shayota that this email was sent mistakenly, the Court finds Justin Shayota's trial testimony that he did not recall any such conversation with Adriana Shayota more credible.

Third, the Government produced evidence showing that after Adriana Shayota learned of the civil lawsuit, she wired $2,000,000 from Baja Exporting to Baja Foodservice's Mexican bank account. ECF No. 500-1, at 4. Additionally, Adriana Shayota was removed as a signatory on the Mexican bank account around time that the $2,000,000 was transferred to that account. ECF No. 500, Ex. A, at 54, 60. Even if this transaction was fully legal, the suspicious timing and round amount of the transfer, as well as the suspicious timing of the removal of Adriana Shayota as signatory, suggests that Adriana Shayota knew that the $2,000,000 were proceeds from the relabeling and counterfeiting conspiracies at issue in the civil depositions.

Fourth, after learning of the 5-Hour ENERGY lawsuit, Adriana Shayota drained the Baja Exporting bank account from $2,900,000 to $0. ECF No. 500, Ex. A, at 58. As with the

56

$2,000,000 wire transfer, the suspicious timing of this complete draining of the bank account suggests that the purpose of this draining was to protect Baja Exporting's funds from the lawsuit regarding 5-Hour ENERGY. This in turn supports the inference that Adriana Shayota knew that the money in the Baja Exporting account was the proceeds of the conspiracies.

Fifth, Adriana Shayota stated that she loaned Walid Jamil $1,525,000 "to assist him in financially getting on his feet." ECF No. 500, Ex. A, at 117. The Court does not credit Adriana Shayota's explanation of this loan, which even McMullen disavowed during closing argument. T. 11/22/16 at 108 ("Wow, if they're handing out million and a half dollar checks to get back on their feet, then sign me up, right?"). Further, McMullen's own version of events does not explain why Adriana Shayota lied about the purpose of the loan or why the loan was not reflected in any documents. Thus, the Court concludes that the most likely reason for this "loan" was to fund the conspiracies.

Sixth, Adriana Shayota gave Walid Jamil a large number of Spanish-labeled bottles of 5-Hour ENERGY and later received from Walid Jamil the same number of bottles, in the same flavors, with English labels. *Id.* at 185–86. The Court finds that the idea of a "swap" is not credible because it is unlikely that Walid Jamil would have agreed to exchange more valuable English bottles for less valuable Spanish bottles. The Court also finds that the idea of a "swap" is not credible because defense exhibits show that Baja Exporting intended to relabel, or "sticker" the Spanish-labeled bottles with English labels for sale in the United States if Living Essentials would not pick up the remaining inventory and reimburse the purchase price or exchange the product with fresh product. *See* Ex. E & Ex. JJJ. Instead, the more plausible explanation for the "swap" is that Joseph and Adriana Shayota conspired with Walid Jamil to relabel the Spanish bottles with English labels.

In short, as discussed in more detail above, there was substantial evidence to justify the verdict against Adriana Shayota. Adriana Shayota's implausible explanations for many pieces of evidence suggest that she is concealing her knowledge of and participation in the conspiracy to distribute relabeled and the conspiracy to manufacture and distribute counterfeit 5-Hour

57

ENERGY. Therefore, the Court DENIES Adriana Shayota's motion for a new trial on the grounds that the verdict was against the weight of the evidence.

Finally, Adriana Shayota argues that even if no single error is significant, together the errors make granting a new trial warranted "in the interest of justice." ECF No. 500, at 13. However, the Court finds that even in the aggregate, the alleged errors in Adriana Shayota's trial were harmless beyond a reasonable doubt and did not affect Adriana Shayota's substantial rights. Fed. R. Crim. P. 52(a). Therefore, the Court DENIES Adriana Shayota's motion for a new trial based on the interests of justice.

## IV. CONCLUSION

For the foregoing reasons, the Court DENIES Adriana Shayota's motion for judgment of acquittal, ECF No. 499, DENIES Adriana Shayota's motion for a new trial, ECF No. 500, and DENIES Joseph Shayota's motion for a new trial, ECF No. 501.

**IT IS SO ORDERED.**

Dated: May 9, 2017

_Lucy H. Koh_
LUCY H. KOH
United States District Judge

United States District Court
Northern District of California